(No. 42463.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* OZELL LINUS, Appellant.

*Opinion filed May 21, 1971.*

GERALD W. GETTY, Public Defender, of Chicago, JAMES B. HADDAD, GEORGE L. LINCOLN and JAMES J.

DOHERTY, Assistant Public Defenders, of counsel,) for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago, (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and ARTHUR BELKIND, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE WARD delivered the opinion of the court:

The defendant, Ozell Linus, was found guilty of murder following a bench trial in the circuit court of Cook County and was sentenced to the Illinois State Penitentiary for a term of not less than 14 years and not more than 40 years. He has appealed directly to this court, contending that constitutional questions are involved. Ill. Rev. Stat. 1969, ch. 110A, par. 603.

On May 17, 1968, a neighborhood Y.M.C.A. sponsored a dance for teenagers at 9430 South Chicago Avenue in Chicago. Young people from the west side of the city and the south side of the city attended the dance. Between 10:00 and 10:30 P.M. a fight broke out between youths from each of these sections of Chicago. Mrs. Hope Terrazas, a chaperone at the dance, was able to stop the fight and she ordered the west side group to leave. Soon thereafter a group of the south side boys also left the hall and the fighting between the groups was resumed in the street and parking lot in front of the hall. During the fight, Daniel Saenz, while standing in the vestibule of the hall, was fatally shot.

At the trial of the defendant for Saenz's murder, Steven Salazar, a high school student, testified that he left the hall and entered the parking lot about 10:45 P.M. He heard someone yell and as he turned in that direction he saw a youth in the middle of the crowd, with a gun in his hand, shoot into the air and then level the gun and shoot directly into the crowd. He described the boy who fired the shots as

dark, with curly hair, about five feet five inches tall, 135 pounds and wearing a dark sweater, gold turtleneck and dark trousers. The second shot, he said, had been aimed toward a group in the vestibule of the hall. He ran to the vestibule where he saw Daniel Saenz lying on the ground. Salazar made a postive in-court identification of the defendant, Ozell Linus, as the boy that he saw shoot toward the group in the vestibule.

Mrs. Hope Terrazas, the chaperone, testified that about 5 or 10 minutes after she had broken up the fight it was resumed outside the hall. She said that she went outside and stood near the entrance to the parking lot. She heard a shot and turned toward the vestibule where she saw the deceased. Turning toward the direction of the shot she observed a boy holding a gun at shoulder height in his left hand. The lighting was good and she said she was only 6 to 10 feet from the boy with the gun and was directly facing him. She described the boy as being dark complected, five feet five inches tall, 135 pounds with curly hair. He was wearing, she said, dark trousers and a gold turtleneck with a dark sweater over it. Mrs. Terrazas made a positive in-court identification of the defendant as the boy who had fired the fatal shot.

Another high school student, Jessie Garcia, testified that he had seen a dark youth with curly hair facing the vestibule of the hall with a gun in his left hand pointed toward the vestibule. The boy he saw, he testified, was five feet five inches to five feet six inches tall, 135 to 140 pounds, and was wearing dark trousers and a dark sweater. It was the defendant, he said. Garcia testified that he had fled from the lot when he saw the gun in the defendant's hand, and shortly thereafter he had heard a shot.

These three witnesses on May 19 at the request of the police went to a local police station where they were asked to pass a room, one by one, and to relate whether they could recognize anyone in the room. The witnesses each identified the defendant as the boy with the gun about whom they later

testified. The defendant was alone in the room and was dressed in a gold turtleneck and a black sweater, wearing brown pants. Steven Salazar and Hope Terrazas were asked by a detective to enter the room in which each had viewed the defendant. When in the room, Salazar testified he asked the defendant, "How does it feel to kill somebody?" The defendant smiled and shrugged his head, he said. Mrs. Terrazas testified she had asked him why he drew a gun. The defendant replied, she said, that it had not been a gun but a hair brush.

Detective John Boeger, the officer who had arrested the defendant, testified that he advised the defendant of his constitutional rights at the time of the arrest and said that later at the station he again advised him of his rights. After a brief conversation, he testified that the defendant asked if he would be allowed to make a phone call and the witness informed him that he could make the call. He escorted the defendant into his supervisor's office and pointed out a phone. Detective Boeger stood about 6 or 8 feet, he said, outside the door of the supervisor's office at the time the defendant placed his call. The reason for standing there at the time of the call, the officer said, was because the defendant was under arrest for murder and there were no bars on the windows of the office. Detective Boeger testified that he heard the defendant ask the person he had phoned: "Did you get rid of the gun?" When the defendant then observed him, he said, the defendant placed his hand partially over the mouthpiece, as a shield, so as to muffle his voice.

The defense called several witnesses who had been with the defendant on the evening of the shooting. Gilbert Gonzalez testified that he had gone to the dance with the defendant, his brother and a third young man and that a fight had broken out in the hall several hours after their arrival. It was carried outside the hall, he said, and during the fight he observed the defendant beside him and then heard a shot. At the time he heard the shot, he said, the defendant

was about five feet from him and did not have a gun in his hand. On cross-examination Gonzalez testified that the defendant was wearing a gold turtleneck, a sweater and dark trousers.

Eddie Ramos, another west side youth, testified that he observed the defendant outside of the hall during the fight and did not see a gun in his hand. During the fight he heard a gun shot, but the defendant, who was only four or five feet from him at that time, did not fire the shot. However, Detective Leslie Greenberg, a rebuttal witness, testified that Eddie Ramos and an Eddie Garcia had on May 18, 1968, voluntarily come to his office and informed him that "Bearhead", which they said was the defendant's nickname, had fired the shot.

Gregory Anguiano, another witness for the defense, related that while fighting outside of the Union Hall he heard a shot. The defendant had been only 2 or 3 feet from him during the fight and the witness did not see a gun in the defendant's hand. On cross-examination the witness admitted that he had been lying when he had told an assistant State's Attorney in an interview before the trial that he had been in a car when the fatal shot was fired and was not engaged in the fight when the shooting occurred. Too, Detective John Downey called by the People as a rebuttal witness, testified that he took a statement from Anguiano on May 18, 1968. In it he said that he was in an auto and was not near the defendant during the fighting.

Tony Limas, another defense witness, stated that he was at the dance when the fight broke out and when the fighting broke out again outside the hall. He testified that he saw the defendant outside the hall and was only five feet from him. He did hear a gun shot, he said, but was not looking in the defendant's direction when the shot was fired. He did not know whether the defendant had fired a gun.

Odell Linus, the twin brother of the defendant, testified that he was near his brother at the time the shot was fired

and that both he and his brother were fighting, using their fists at that time. His brother did not have a gun on the evening of the shooting and had never owned a gun. Detective John Boeger testified in rebuttal that in a conversation with Odell Linus at his home on May 19, 1968, Odell told him that when the fighting groups had left the hall he had been separated from his brother. He said, the officer testified that he did not know whether his brother had fired the shot.

The defendant testified that he did not have a gun or any other weapon on the evening of the shooting and that he did not shoot the victim. He stated that he heard a shot, but that it was fired about 15 feet away from him and he was unable to see who fired it because he was fighting at the time. He acknowledged that he was left-handed and on cross-examination also acknowledged that on the evening of the shooting he was wearing a dark sweater with a gold turtleneck and dark trousers. He declared he did not know his exact height and weight. He did say he didn't believe he was over five feet six inches and said he weighed about 125 pounds on the date of the dance.

This was substantially the evidence presented and on the basis of it the trial judge found the defendant guilty.

The defendant contends here that (1) the trial court erred in admitting evidence of the defendant's silence after he had been advised of his rights under *Miranda* and in admitting a statement secured without a waiver of those rights; and that (2) the defendant's constitutional and statutory rights to counsel were violated by the admission of evidence of his overheard telephone conversation.

The defendant says that *Miranda* was violated when one of the detectives investigating the murder directed Steve Salazar and Mrs. Terrazas, after they had viewed the defendant, to enter the room where he was sitting. It is argued that the only purpose the police had in requesting these witnesses to enter and confront the defendant after they had

identified him was to attempt to secure a statement from him. The defendant's position is that these private citizens were used as agents of the police to induce a statement from him and circumvent the protective directions of *Miranda*. Error was thus committed when Salazar and Mrs. Terrazas were permitted to testify as to the defendant's conduct in the room where he was detained.

However, this contention of error is not available here to the defendant. One cannot on appeal raise the issue of the admissibility of evidence where there has not been objection to its admission during the trial. (See *People* v. *Adams,* 41 Ill.2d 98; *People* v. *McMath,* 40 Ill.2d 388; *People* v. *Underhill,* 38 Ill.2d 245, and *People* v. *Harris,* 33 Ill.2d 389.) As it was put in *People* v. *Thompson,* 48 Ill.2d 41, 45: "Objections to evidence may be waived by failure to interpose proper objections in apt time, even though based upon constitutional grounds. (*People* v. *Trefonas,* 9 Ill.2d 92, 98; *People* v. *McCrimmon,* 37 Ill.2d 40, 47; *People* v. *Hicks,* 35 Ill.2d 390, 395; see *Mapp* v. *Ohio,* fn. 9, 367 U.S. 643, 659, 6 L. Ed. 2d 1081, 1092, 81 S. Ct. 1684, 1693.) The rationale underlying the procedural waiver doctrine is a sound one, based upon the need for timely resolution at trial of evidentiary questions. The salutary consequence of the waiver rule is that 'A party cannot sit by and permit evidence to be introduced without objection and upon appeal urge an objection which might have been obviated if made at the trial.' (*People* v. *Trefonas,* 9 Ill.2d 92, 98.)"

The next position the defendant advances is that his constitutional and statutory rights to counsel were violated by the admission into evidence, over objection, of the statement overheard by the policeman during the defendant's telephone conversation at the police station. He says that this constituted a denial of effective assistance of counsel. An allied contention is that his right to consult in private with his attorney which he says is guaranteed specifically in Illinois by section 103—4 of the Code of Criminal Pro-

cedure (Ill. Rev. Stat. 1969, ch. 38, par. 103—4) was also violated by the admission of the police officer's testimony. It is to be observed that the defendant does not claim that he in fact called his attorney or was speaking with his attorney at the time his conversation was overheard. He nevertheless argues that his constitutional and statutory rights to effective assistance of counsel were denied because at the time the officer heard the defendant speaking the officer believed he was speaking with his attorney.

We cannot say that the admission of the evidence was improper. It is not shown nor even claimed that the defendant intended to and did in fact phone an attorney, much less conduct a professional consultation. We are being asked to rule on a question not supported by the record—a suppositious question. Further, what the record does show is a denial by the defendant when he testified that he did make a telephone call from the police station. There is nothing to suggest the officer believed the defendant was conversing with an attorney. There is no necessity of considering further the question the defendant advances.

It was the function of the trial judge to assess credibility and weigh the evidence. We consider the evidence presented established the guilt of the defendant beyond a reasonable doubt. *People* v. *Sailor,* 43 Ill.2d 256; *People* v. *Pelegri,* 39 Ill.2d 568; and *People* v. *Rossolille,* 38 Ill.2d 316.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*