(No. 43079.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EUGENE LEE NEWBURY, Appellant.

*Opinion filed November 30, 1972.*

GOLDENHERSH, J., dissenting.

ROBERT P. WILL, JR., Public Defender, of Zion, and RICHARD C. CHRISTIAN and MATTHEW J. MORAN, of the Illinois Defender Project, of Elgin, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and JACK HOOGASIAN, State's Attorney, of Waukegan (JAMES B. ZAGEL and ROBERT E. DAVISON, Assistant Attorneys General, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

Eugene Lee Newbury, the defendant, was found guilty of the murder of Anna Louise Mondragon by a jury in the circuit court of Lake County. The jury, in its verdict, recommended that the defendant be sentenced to death, and following a hearing in aggravation and mitigation the trial court did sentence him to death. The defendant has appealed.

On December 20, 1968, the body of Anna Mondragon, a school teacher, was found in a field in Lake County near the Illinois State Dunes Beach Park. There were bruises on her face, neck, chest, and legs. Her nose appeared to have been broken. There were several cuts on her legs, which had been circled with a crayon or other marking device. A pencil was protruding from her right eye. Her undergarments were around her ankles, although there was no evidence that she had been sexually assaulted. A checkbook had been placed partially within her vagina and several staples had also been inserted in her vagina. A small balloon was tied to her left hand. Death had resulted from asphyxiation due to obstruction of the airways, and grass and dirt had been stuffed into her mouth.

The defendant had been engaged to be married to the deceased. On the evening of December 19, the two had been together. They stopped at an optometrist's office and a bridal shop in Zion, Illinois, shortly before eight o'clock

that evening. The deceased was not seen alive after that time.

Shortly after midnight on the morning of December 20, the defendant, alone, registered at a motel in Madison, Wisconsin, as Mr. and Mrs. Newbury. The motel clerk noticed what appeared to be blood on his hands, shirt and jacket. He apparently remained in the motel room for two days. On December 22, a deputy sheriff of Dane County, Wisconsin, went to his motel room in response to a call from the defendant, who said that he wanted to talk to the officer about something he was involved in. The officer advised the defendant of his rights and he then refused to make any statement.

The defendant was later indicted for the murder of Miss Mondragon. He was determined to be competent to stand trial after a hearing, and no issue is raised concerning that determination. He pleaded not guilty, and at trial he raised the question of his sanity at the time of the offense. Except for that question, he does not contend that the State failed to prove him guilty beyond a reasonable doubt. It may be noted, however, that the State presented evidence which established that it was the defendant who took the life of the deceased. In addition to the conduct that has been described, this evidence included the eyeglasses found at the scene, which were shown to be identical to those previously worn by the defendant, tire tracks at the scene which were similar to those of the defendant's automobile, blood stains on the clothes of the defendant which matched the blood type of the deceased, and a matching of impressions on the body of the deceased with the fabric lines of the corduroy trousers which the defendant wore on the date of the killing.

The first contention is that the defendant "was deprived of a fair trial by erroneous rulings on insanity testimony." Dr. Leigh Roberts, a psychiatrist, was called as a witness by the defendant. He had been employed by the defendant and he had examined the defendant six times

between December 27, 1968, and January 3, 1969, for the purpose of diagnosing and treating him. The doctor was of the opinion that on December 19 and 20 the defendant suffered from schizophrenia, paranoid type, and that he could neither appreciate the criminality of his conduct nor conform his conduct to the requirements of law. In response to a question asked by defense counsel on direct examination, Dr. Roberts testified to statements the defendant made to him, in which he described how he killed Miss Mondragon. It is now contended that the trial court erred in allowing this evidence, offered in connection with the question of the defendant's mental capacity, to be considered by the jury in determining whether he killed Miss Mondragon.

If Dr. Roberts had examined the defendant in connection with a court-ordered examination, the statements made to him by the defendant could not have been admitted against the defendant on the issue of his guilt. (Ill.Rev.Stat. 1969, ch. 38, par. 104—2(d).) In this case the doctor was privately retained and voluntarily consulted by the defendant, but even in such a case the statutory psychiatrist-patient privilege can be used to exclude statements made by a defendant to his psychiatrist. (Ill.Rev.Stat. 1969, ch. 51, par. 5.2.) But it was the defendant who called the doctor as a witness and elicited his testimony concerning the defendant's statements. Thus the defendant waived the privilege and he cannot now contend that it was error to admit the testimony. *Cf.* 8 Wigmore, Evidence (McNaughton Rev. 1961), sec. 2390(2) at 861.

Similarly, no error was committed by the trial court in not limiting the statements testified to by the doctor to the issue of the defendant's sanity. As the statements constituted an admission by the defendant, they were not objectionable under the hearsay rule. (4 Wigmore, Evidence (3d ed. 1940), sec. 1048(2), at 3.) The use of a defendant's statements to psychiatrists may raise issues

concerning the defendant's privilege against self-incrimination when the defendant makes the statements in a court-ordered examination (see W. LaFave & A. Scott, Jr., Handbook on Criminal Law (1972), sec. 40 at 310-312), but in this case the State played no part in eliciting the statements, and their use cannot violate the defendant's privilege against self-incrimination.

Nor do we find merit in the contention on appeal that the defendant's statements to the doctor were improperly admitted because they were made by an insane individual where, as here, the defendant has been found competent to stand trial, the testimony was elicited by defense counsel, and no effort was made at trial to exclude the testimony or to strike it once it had been given. Indeed, the record fails to disclose any attempt by defense counsel to have the court instruct the jury that they were not to consider these statements in determining whether the defendant had committed the offense.

Another psychiatrist, Dr. Henry Millett, had been appointed to examine the defendant for the purpose of his pretrial competency hearing and was called as a witness at trial by the defendant. It was Dr. Millett's opinion, given in response to a hypothetical question, that the defendant was psychotic and that he lacked the capacity to appreciate the criminality of his conduct and the ability to conform his conduct to the requirements of law. It is contended that the conviction should be reversed because the trial court refused to allow defense counsel to incorporate the history given to Dr. Roberts into the hypothetical question asked of Dr. Millett.

The trial judge subsequently changed his ruling, and allowed the psychiatrists who testified for the State to consider that history in arriving at their conclusions. But when the court ruled that the State's psychiatrists could consider the defendant's statements to Dr. Roberts, defense counsel indicated that he might want to recall Dr. Millett and include the same material in questions to him.

The trial judge told defense counsel that he could move to recall Dr. Millett at the close of the State's case, and he would not consider such a motion until then. Counsel did not make such a motion, and thus waived the opportunity to cure any possible prejudice that might have resulted.

The defendant also contends that the State failed to prove beyond a reasonable doubt that he was legally sane at the time of the commission of the offense. As previously mentioned, the defendant called two psychiatrists, both of whom testified that at the time of the offense the defendant suffered from a mental disease which made him incapable of appreciating the criminality of his conduct and unable to conform his conduct to the requirements of law. Other witnesses testified concerning the defendant's outstanding record as a scholar and an athlete in high school and college, and his performance as a grade school teacher, a position which he held at the date of the killing.

The three psychiatrists called by the State had not examined the defendant. In response to hypothetical questions incorporating the facts in evidence, it was the opinion of all three that the hypothetical person did not suffer from a mental disease and that he could understand the criminality of his conduct and conform his conduct to the requirements of law. It was for the jury to decide, based upon all of the evidence, whether the defendant was insane at the time of the offense. Although there was conflicting expert testimony on this issue, there was sufficient evidence from which the jury could conclude, beyond a reasonable doubt, that the defendant was legally sane at the time of the offense. As this court has previously held, there is no constitutional right to a bifurcated trial and it was not error to deny the motion for such a trial. *People v. Speck (1969), 41 Ill.2d 177, 206-208; People v. Ford (1968), 39 Ill.2d 318, 320-321.*

The defendant also urges that his conviction should be reversed because of three rulings of the trial judge relating

to pretrial discovery. The first of these concerns the fact that the trial court did not allow that portion of a motion for the discovery of certain specific items of evidence which requested that the State furnish the defense with all items of evidence, and the names of witnesses, that would tend to exculpate the defendant or provide "mitigating factors." The prosecution is required to disclose to an accused all evidence favorable to his case (*Brady v. Maryland (1963), 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194; People v. Moses (1957), 11 Ill.2d 84, 89*), and since October 1, 1971, our rules concerning pretrial discovery have required the prosecution to disclose that information to the defendant, whether or not he has requested it. (Rule 412(c), 50 Ill.2d R. 412(c).) This case, however, was tried before the adoption of Rule 412. It is a case in which the proof of the defendant's guilt is such that the defendant does not dispute that he was proved guilty beyond a reasonable doubt. Counsel for the defendant has not suggested, even hypothetically, any kind of evidence that might have tended to exculpate him, nor is it suggested that the prosecution suppressed favorable evidence or relied upon false testimony. We therefore hold that the trial court's refusal to grant the motion for the discovery of evidence favorable to the accused did not constitute reversible error. *Cf. People v. Yonder (1969), 44 Ill.2d 376, 388-390.*

The second error relating to discovery relates to the failure of the prosecution to provide a list of the witnesses it would call at trial until four months after the defendant's arrest. There is no merit to this contention. The trial was delayed by the competency hearing, and the list of witnesses was furnished two weeks after the determination of competency and almost three months before trial. The defendant has shown no prejudice resulting from the delay, and he did not request a continuance because of it. *Cf. People v. Raby (1968), 40 Ill.2d 392, 401-402.*

The third of the alleged discovery errors concerns the

denial of his request to inspect photographs of the scene of the crime and of the body of the deceased. The implication is apparently that the ruling of the trial court prevented him from examining those photographs which were used at the trial by the prosecution. The record shows, however, that the trial court granted the defendant permission to inspect and copy "photographs pertaining thereto at the alleged scene of the occurrence in question if they are going to be introduced into evidence." Thus the denial of the defendant's request related only to photographs which were not to be used at the trial. Unless photographs are favorable to the defense, and there is no such contention, they are not automatically discoverable by the defendant unless the prosecution intends to use them at trial or unless they were obtained from the defendant. (See Rule 412(a)(v), 50 Ill.2d R. 412(a)(v); ABA Standards Relating to Discovery and Procedure Before Trial, sec. 2.1, commentary, at 68.) The trial court did not abuse its discretion in denying the defendant's request.

The defendant now contends that his conviction should be reversed because the police officer who went to the defendant's motel room at his request was allowed to testify that after he had warned the defendant of his constitutional rights, the defendant refused to make a statement and telephoned an attorney who arranged to meet the defendant and the officer at the police station. At the trial defense counsel objected to the officer's reading from an admonition form which was similar to but not the same as that which he had read to the defendant, on the ground that it was not relevant. But he made no objection to the officer's testimony about the defendant's refusal to make a statement or his telephone call to an attorney, probably because the evidence did not show custodial interrogation. Since there was no pertinent objection at the trial, the defendant cannot now assert that the admission of this testimony violated his constitutional

privilege against self-incrimination. *People v. McCorry (1972), 51 Ill.2d 343, 351; People v. Linus (1971), 48 Ill.2d 349, 354-355.*

The defendant also complains of the rulings of the trial judge concerning two items of evidence, both of which bore upon the victim's state of mind—the state of her emotions—toward the defendant. One of these items was a torn photograph of the defendant which was found by a deputy sheriff in a dresser drawer in the bedroom of her apartment on December 21, 1968. The other was the proffered testimony of one of the victim's co-teachers, who was to be a bridesmaid, that in a telephone conversation which took place about 6 P.M. on December 19, she and the victim discussed alterations in their gowns for the wedding. The first of these items, the photograph, was admitted in evidence, over objection, during the prosecution's case. The second, the testimony of the bridesmaid concerning the victim's continuing intention, a few hours before her death, to marry the defendant, was excluded when offered by the defense.

The defendant objected to the admission of the torn photograph on the ground that there was no proof as to who tore it or when it was torn. The trial judge ruled, "It's true there is no showing if he finds a picture, who tore it. There are inferences. For that reason I am going to let it go." In support of that ruling the prosecution argues: "The torn photo found in the victim's apartment raises the inference and is consistent with the prosecution's theory and, thus, tends to substantiate the fact that there was a disagreement between the defendant and the victim. \*\*\* The inference is that it belonged to the victim and that she tore it, and any question with respect thereto was properly for the jury to consider."

The chain of inferences thus relied upon by the prosecution runs from the fact that the torn photograph was found in the victim's room to the fact that it was she who tore it, and that she had done so shortly before her

death because of "a disagreement between the defendant and the victim." Whether conduct of the type here involved should be regarded as subject to the hearsay rule is a question that has elicited differing views among courts and scholars. (See McCormick, Handbook of the Law of Evidence (1954), sec. 229.) But even if the conduct is considered hearsay, it would be admissible under the exception governing hearsay declarations concerning the declarant's emotional state or attitude.

The difficulty with the photograph is not its hearsay aspect, but the fact that its relevance depended upon unproved assumptions—that it was torn recently and that it was torn deliberately and by the deceased. In the absence of further proof we are of the opinion that the photograph should have been excluded.

As to the testimony of the bridesmaid, the prosecution argues that the "inference was raised in the instant case that the wedding between the defendant and the victim was cancelled," and that the testimony concerning what the victim said about her wedding plans "was aimed at discrediting the prosecution's inference," and was therefore hearsay. That was the avowed purpose of the testimony, and it was indeed hearsay. But as defense counsel pointed out, the state of mind of the deceased had been put in issue, and the proffered testimony fell within the recognized exception to the hearsay rule governing declarations as to mental or emotional attitudes. It should not have been excluded. See McCormick on Evidence (1954), sec. 268.

Both of the evidentiary rulings of which the defendant complains were erroneous, but in our opinion the errors do not require reversal. As to the photograph, the defense brought out that the defendant had told his psychiatrist that Miss Mondragon had torn a picture of him which he had given to her. And as to the co-teacher's testimony, numerous other witnesses testified that a good relationship existed between the defendant and the deceased. The

proof was so convincing that we conclude, beyond a reasonable doubt, that the jury would have found the defendant guilty of the offense even if the picture had been excluded from evidence and the testimony of the victim's co-teacher had been admitted.

The defendant argues, *pro se*, that it was error to deny his motion to conduct the *voir dire* examination of each juror individually, out of the presence of any other jurors. Under Rules 431 and 234 (Ill.Rev.Stat. 1971, ch. 110A, pars. 431, 234), the trial judge may, in his discretion, so conduct the *voir dire,* but he is not required to do so. The motion as presented in the trial court related specifically to pretrial publicity, concerning which no issue is now raised. The contention now advanced is that the adverse reaction of some jurors to an insanity defense, expressed on their *voir dire* examination, prejudiced other members of the panel against that defense. We regard this contention as entirely speculative, and hold that no abuse of discretion was shown.

The defendant also asserts that prejudicial error was committed when the State's Attorney asked the defendant's father on cross-examination certain questions regarding funeral services of the decedent.

"Q. Did you attend the funeral of Anna Mondragon?
A. No.
Q. Did you go to the wake in Zion?
A. No.
Q. Did your wife go?
A. No."

At this point a defense objection was sustained. The State's Attorney returned to the subject, however, and the following ensued shortly thereafter:

"Q. And you say that Mrs. Newbury and you got along fine with Anna Mondragon?
A. Yes.
Q. And yet you did not go to the wake in Zion?
A. I did not know there was a wake. Nobody notified us of the wake. We didn't even know where Anna was at."

Attached to the defendant's motion for a new trial was the affidavit of the funeral director in Zion, who swore that he shipped the body of the deceased to New Mexico at the request of her family, and that there was no wake, funeral or memorial service in Zion, Illinois, or elsewhere in Lake County, Illinois. But even if we assume that there was such a service, the questions were irrelevant and appear to have been deliberately designed to prejudice the defendant. In a case in which the proof was less convincing than this one, they would warrant reversal.

It is also contended that the photographs of the body of the deceased that were received in evidence were inflammatory and denied the defendant a fair trial. Those photographs showed the unusual condition of the victim's body as it was found at the scene of the crime and demonstrated the manner in which she was killed. They served a proper purpose and it was not error to admit them in evidence. *People v. Nicholls (1969), 42 Ill.2d 91, 99-100.*

For the reasons stated, the judgment of conviction should be affirmed. As to the sentence, the Supreme Court of the United States has recently ruled that a defendant may not be validly sentenced to death under the statutes that govern this case. (*Moore v. Illinois (1972), 408 U.S. 786, 33 L.Ed.2d 706, 92 S.Ct. 2526; Furman v. Georgia (1972), 408 U.S. 238, 33 L.Ed.2d 346, 92 S.Ct. 2726.*) We therefore affirm the judgment of conviction, and vacate the sentence of death imposed on the defendant. The case is remanded to the circuit court of Lake County with directions to conduct a new hearing in aggravation and mitigation and to resentence the defendant to a sentence other than death.

*Affirmed and remanded,*
*with directions.*

MR. JUSTICE GOLDENHERSH, dissenting:

I respectfully dissent from the majority opinion. In

my opinion the trial court's error in holding that the defendant's statements to Dr. Roberts were admissible as evidence that defendant had killed Miss Mondragon and the inconclusive and unsatisfactory nature of the proof adduced by the People on the issue of insanity, when considered in the light of other admitted error, require reversal of the judgment and remandment for a new trial.

In approving the trial court's ruling that defendant's statements to Dr. Roberts could be considered as evidence of guilt, the majority cites 8 Wigmore, Evidence (McNaughton Rev. 1961, sec. 2390(2)) which is not in point. Wigmore states, "To call a physician to the stand, and *examine him as a witness* to one's physical condition formerly communicated to him, is a waiver of the privilege in regard to *all* of his knowledge of the physical condition asked about. No reasoning could maintain the contrary." Of course, as Wigmore states, the statements were to be considered on the issue of defendant's mental condition, but that is not the issue here presented, and obviously the quotation from Wigmore does not touch on the question of whether the statements are evidence of defendant's having committed the offense.

The majority also cites section 1048(2) of Wigmore which discusses hearsay evidence, and is also not in point. The issue presented here is not whether the defendant's statements were hearsay, but the extent to which, and for what purpose, they were to be considered by the jury.

The majority concedes that if "Dr. Roberts had examined the defendant in connection with a court-ordered examination, the statements made to him by the defendant could not have been admitted against the defendant on the issue of his guilt." As I have pointed out, the quotation from Wigmore does not support the distinction which the majority attempts to draw and no other authority is cited.

In *Watts v. Indiana, 338 U.S. 49, 52, 93 L. Ed. 1801, 1805, 69 S. Ct. 1347, 1349,* Mr. Justice Frankfurter said,

"And there comes a point where this Court should not be ignorant as judges of what we know as men." This court must recognize as a practical matter that if the rule which the majority has laid down stands, no defendant will run the risk of seeking an independent psychiatric examination and the only testimony ever adduced on the issue of insanity will be that of the psychiatrist who makes the court-ordered examination.

This record demonstrates dramatically why a defendant should not be confronted with this Hobson's choice. On the issue of insanity the People offered the testimony of three psychiatrists whose opinions were stated in response to hypothetical questions and not one of whom had examined the defendant. It does not seem inappropriate to suggest that the least that should be required of a disciple of Aesculapius whose opinion may subject a defendant to the death penalty (the original sentence in this case) is that he examine, and not perfunctorily, the individual whose mental state he purports to evaluate.

The same reasons which justify the physician-patient and attorney-client privileges require that a defendant whose sanity is in issue in a criminal case be able to obtain an independent psychiatric examination without fear that disclosures essential to a diagnosis of his condition be treated as confessions of guilt. Furthermore, confronted with so inexact a science as psychiatric medicine, in which the same clinical evidence results in widely divergent diagnoses, the question of whether the statements made to the physician by the patient are to be admitted solely to show the basis for the diagnosis, or whether they are also to be substantive evidence of guilt should not depend upon the artificial distinction which the majority has drawn.

The majority opinion recognizes that the trial court erred in admitting the torn photograph into evidence and erred in excluding the testimony of the bridesmaid, and states that "in a case in which the proof was less convincing than this one" the asking of the improper

questions with respect to defendant's parents' failure to attend Miss Mondragon's wake would warrant reversal. We, of course, do not know the extent to which these errors affected the jury's verdict nor can we measure the weight given the admissions made to Dr. Roberts in determining defendant's guilt. Furthermore, considering the statements to Dr. Roberts as what they are, disclosures made to a physician for purposes of diagnosis, and not as substantive evidence of guilt, this court might find the proof of guilt "less convincing."

Save for the circumstance of the Supreme Court's decision in *Moore v. Illinois, 408 U.S. 786, 32 L. Ed. 2d 706, 92 S. Ct. 2562,* this would be a capital case and this court, previously, has gone to great lengths to insure careful review of the record in capital cases to the end that the judgment be based on a record free of prejudicial error. The fact that defendant cannot be executed should not diminish the degree of care with which the record is examined and although the evidence of guilt is strong and the crime heinous, defendant should not be deprived of a trial free of error.