(No. 88843.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MICHAEL WAGENER, Appellant.

*Opinion filed June 1, 2001.*

James Geis, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Katherine Blakey Cox, William D. Carroll and Alan J. Spellberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Michael Wagener, was charged with first degree murder (720 ILCS 5/9—1(a) (West 1994)) and concealment of a homicidal death (720 ILCS 5/9—3.1 (West 1994)). After a bench trial in the circuit court of Cook County, he was found guilty but mentally ill of both offenses. The court imposed consecutive prison sentences of 50 years for his murder conviction and 5 years for his conviction of concealment of a homicidal death. The appellate court affirmed. No. 1—98—1561 (unpublished order under Supreme Court Rule 23). We granted defendant leave to appeal (177 Ill. 2d R. 315), and affirm his convictions and sentence.

## BACKGROUND

Defendant does not challenge the sufficiency of the evidence of his guilt, nor does he contend that the circuit court's conclusion that he was guilty but mentally ill, rather than legally insane, was against the manifest weight of the evidence. Accordingly, we will set out only the facts relevant to the issues raised in this appeal. For context, we note that the State proved the following facts in its case in chief. On December 2, 1994, defendant fatally bludgeoned and strangled his wife, Mary, in their home in Chicago. He wrapped her body in plastic and hid it under the back porch of the house. He then drove to Menominee, Wisconsin, with his daughter, Ashley, where he checked into a hotel using an assumed name and address. He was arrested at the hotel on December 5. While in police custody, he gave a statement in which he admitted killing his wife and secreting her body at their house.

Defendant's trial strategy was an insanity defense. See 720 ILCS 5/6—2 (West 1994). He called his two sisters as witnesses. Both stated that defendant blamed the September 1989 loss of his job at a major Chicago law firm on a conspiracy to "ruin his life." Defendant

believed that people were putting chemicals in his work area so that he would itch and sneeze all day, "messing with" papers in his office and talking about him behind his back, "doing things" to his telephone, and following him. In subsequent conversations, defendant stated that the firm had "enlisted the CIA, the FBI, the post office, just about everybody to continue to ruin his life." He believed that there were listening devices in his house and spent thousands of dollars to have the house "debugged" multiple times. His sisters tried to get defendant psychological help, but he refused.

Defendant was also extremely overprotective of his children and fearful for their safety. When his son, Richard, died of sudden infant death syndrome in February 1994, defendant believed his wife had killed the child and he became very depressed. Although defendant and his wife began to go to marriage counseling in the summer of 1994, defendant remained depressed and continued to believe that his wife had killed their son.

One of defendant's sisters, Cathy Michiels, had several telephone conversations with defendant on December 3, 1994, the day after the murder. In the course of the conversations, defendant told her that his daughter was with him and was all right, but when Michiels asked him if he had hurt his wife, he told her "it was bad, that it was very bad, it was extreme." Defendant told Michiels that his wife had confessed to killing their son. Defendant told Michiels that he needed a lawyer. Michiels referred him to Thomas Gooch, an Illinois attorney.

Michiels was subsequently contacted by a different attorney, who told her that defendant wanted Michiels to come to Menominee and get Ashley before defendant turned himself in. Michiels contacted Gooch to ask if he knew anything about the arrangement. Michiels testified that Gooch told her that "he was aware of it, that he thought that [defendant] was—that it wasn't really an

attorney that called him. He thought it was [defendant] pretending, you know, to be an attorney and he wasn't driving up to Menominee so he had contacted the Chicago Police Department and called them." Michiels did drive to Menominee to take custody of Ashley.

During cross-examination, the State asked Michiels, over objection, about another conversation she had with attorney Gooch. Michiels denied recalling that Gooch had told her that defendant had "asked him what the punishment was for committing a capital crime and crossing state lines." However, she admitted that it was possible that she had so told a police officer.

The defense also called three expert witnesses on the topic of defendant's sanity. Drs. Larry Heinrich, Marvin Schwarz, and Matthew Markos all testified that at the time of the crime defendant was insane—he could not appreciate the criminality of his offense, nor could he conform his conduct to the requirements of the law. Each believed that defendant had a delusional psychotic disorder, and that he had killed his wife because he believed his wife meant to kill Ashley, just as he believed she had killed their other child.

Each expert testified that he had reviewed the police reports generated in connection with the case. One of these reports contained the statement with which the State had cross-examined Michiels—that attorney Gooch had told her that defendant had asked him about the penalty for committing a capital crime and then crossing state lines. The State cross-examined all of the defense experts with this statement, over defendant's continuing objection to the line of questioning.

In rebuttal the State presented an expert, Dr. Carl Wahlstrom. Dr. Wahlstrom agreed with the defense experts that defendant was suffering from a "persecutory" type of delusional disorder. However, he testified that defendant was sane at the time of the crime. One of

the reasons for his conclusion was defendant's ability to "very carefully conceal the crime." Specifically, Dr. Wahlstrom relied in part on the fact that when defendant arrived in Menominee, "he contacted an attorney regarding the issue of having—regarding everything that is involved and the commission of two [sic] capital crimes."

The court found defendant guilty but mentally ill of first degree murder and concealment of a homicidal death. At a subsequent hearing, defendant was sentenced to consecutive terms of 50 years' imprisonment for his murder conviction and 5 years' imprisonment for his concealment conviction. The appellate court affirmed. No. 1—98—1561 (unpublished order under Supreme Court Rule 23). We granted defendant leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

Defendant argues that his conviction should be reversed for violations of his attorney-client privilege. In supplemental briefing, defendant contends that his sentence should be vacated because section 5—8—4(b) of the Unified Code of Corrections (730 ILCS 5/5—8—4(b) (West 1994)), under which his sentences were made consecutive, is unconstitutional.

### I. Attorney-Client Privilege

Defendant first contends that he is entitled to a new trial. He argues that his conversation with attorney Gooch was protected by the attorney-client privilege, and that the disclosure in the police report that he had asked attorney Gooch about the penalty for committing a capital crime and crossing state lines breached his privilege. He maintains that the State's use of this evidence at trial constituted reversible error. Although the State does not admit that the statements to attorney Gooch were privileged, it contends that assuming that they were initially privileged, defendant waived the privilege. We agree.

We assume, *arguendo*, that defendant's conversation with attorney Gooch was privileged at the time it occurred. We also assume that the privilege remained intact despite the disclosure by Gooch to defendant's sister, her subsequent disclosure to the police, and the recording of that statement in the written report. Indeed, the State does not maintain that any privilege which might have attached to defendant's statement was waived by any of these acts. Instead, the State asserts that defendant waived any privilege by giving the police report containing the statement to his *testifying* expert witnesses.

We begin with the general rule that experts may be cross-examined for the purpose of discrediting their testimony, as well as to ascertain which factors were taken into account and which were disregarded in arriving at these conclusions. *People v. Williams*, 181 Ill. 2d 297, 329 (1998). Opposing counsel is allowed to cross-examine an expert with respect to material which he has reviewed but upon which he did not rely. *People v. Page*, 156 Ill. 2d 258, 275 (1993), quoting *People v. Pasch*, 152 Ill. 2d 133, 179 (1992). Indeed, counsel may venture *beyond* the facts supported by the record in inquiring as to what changes of conditions would affect his opinion. *Williams*, 181 Ill. 2d at 329; *Page*, 156 Ill. 2d at 275; *Pasch*, 152 Ill. 2d at 179. Thus the general rule would allow the State to cross-examine the experts with the content of a report included among the materials which they considered in forming their opinions.

Defendant does not dispute the above law, but contends that general rules regarding cross-examination of experts are beside the point in this case. He contends that it is irrelevant that the police report containing his statement was supplied to the psychiatric experts testifying for the defense because the statement was still privileged. Defendant argues that "in insanity cases the attorney-client privilege applies to information received

by the defense mental health experts in the same manner as it does to the defendant's attorney." He relies on this court's opinion in *People v. Knuckles*, 165 Ill. 2d 125 (1995). There, this court extended attorney-client privilege to communications between a defendant and a psychiatric expert, in order to "accord the common law attorney-client privilege the scope necessary to meet the complexities of modern legal practice." *Knuckles*, 165 Ill. 2d at 135.

However, *Knuckles* distinguished between testifying and nontestifying experts. Communications between a defendant raising an insanity defense and a psychiatric expert are protected by the attorney-client privilege only so long as "the psychiatrist will not testify and the psychiatrist's notes and opinions will not be used in the formulation of the other defense experts' trial testimony." *Knuckles*, 165 Ill. 2d at 140. Contrarily, the privilege is waived "with respect to the testimony and reports of those experts who are identified by the defense as witnesses who will be called to testify on behalf of the defendant at trial, or whose notes and reports are used by other defense experts who testify." *Knuckles*, 165 Ill. 2d at 139.

Thus *Knuckles* is of no help to defendant. Drs. Heinrich, Schwarz and Markos all testified at trial. Thus, the attorney-client privilege between them and defendant was waived.[1] *Knuckles*, 165 Ill. 2d at 139. Because the communication had been revealed to these persons with whom the privilege was waived, defendant waived the privilege entirely. See *Profit Management Development, Inc. v. Jacobson, Brandvik & Anderson, Ltd.*, 309 Ill.

---

[1]Neither party raises any argument regarding whether the privilege was waived when defendant's trial counsel initially listed the experts as testifying witnesses, or remained intact until the experts actually took the stand. Accordingly, we express no opinion on this question.

App. 3d 289, 299 (1999) ("[a]ny disclosure by the client is inherently inconsistent with the policy behind the privilege of facilitating a confidential attorney-client relationship and, therefore, must result in a waiver of the privilege"); *People v. Childs*, 305 Ill. App. 3d 128, 136 (1999) (same); *Fidelity & Casualty Co. v. Mobay Chemical Corp.*, 252 Ill. App. 3d 992, 1000-01 (1992) (same).

Defendant relies on *Regan v. Garfield Ridge Trust & Savings Bank*, 220 Ill. App. 3d 1078 (1991), for the proposition that a party does not waive the protection of the attorney-client privilege by calling a witness who does not testify as to privileged matters. In *Regan*, the plaintiff called his prior attorney as a witness to testify regarding the attorney's dealings with defendants and their lawyers. When defendants attempted to cross-examine the attorney regarding conversations with his client, the attorney refused to answer, asserting attorney-client privilege. The appellate court agreed with the trial court that the privilege had not been waived. *Regan*, 220 Ill. App. 3d at 1090-91.

*Regan* is distinguishable because, in the instant case, the waiver did not depend on the substance of the witnesses' testimony. The mere fact *that they testified* waived attorney-client privilege between them and defendant. *Knuckles*, 165 Ill. 2d at 139. While we agree with *Regan* that the attorney-client privilege is not waived by simply calling an attorney as a witness to matters not involving the privilege, the attorney-client privilege between a defendant and a psychiatric expert depends upon the expert's not testifying *at all*. Once this fact changes, the privilege is waived. *Knuckles*, 165 Ill. 2d at 139-40. Accordingly, the privilege was waived in its entirety with respect to all information defendant had shared with the experts, just as it would be by the voluntary revelation of a privileged communication to any person with whom the privilege was not shared. See *Profit Management*

*Development*, 309 Ill. App. 3d at 299; *Childs*, 305 Ill. App. 3d at 136; *Fidelity & Casualty Co.*, 252 Ill. App. 3d at 1000-01.

In his opening brief to this court, defendant argues that the privilege could not have been waived by attorney Gooch's disclosure to defendant's sister. He bases this contention on statements in various cases that a client will not be held to have waived the privilege through an unauthorized disclosure by his counsel. See, *e.g.*, *Himmelfarb v. United States*, 175 F.2d 924 (9th Cir. 1949); *Mendenhall v. Barber-Greene Co.*, 531 F. Supp. 951 (N.D. Ill. 1982); *Chavez v. Watts*, 161 Ill. App. 3d 664 (1987); *People v. Mudge*, 143 Ill. App. 3d 193 (1986); 8 J. Wigmore, Evidence § 2325 (McNaughton rev. ed. 1961). However, as previously noted, the State does not argue that Gooch's disclosure constituted a waiver of the privilege.

Moreover, as the State notes in response, this rule does not vitiate the waiver which occurred in this case when defendant's *trial* counsel disclosed the information to the testifying expert witnesses. The very section of Wigmore upon which defendant relies states that

"[s]ince the attorney has implied authority from the client *** to make admissions and otherwise to act in all that concerns the management of the cause, all disclosures (oral or written) *voluntarily* made to the opposing party or to third persons in the course of negotiations for settlement, or in the course of taking adverse steps in litigation *** are receivable as being made under an implied waiver of privilege, giving authority to disclose the confidences when necessary in the opinion of the attorney. This is so unless it appears that the attorney has acted in bad faith toward the client." (Emphasis in original.) 8 J. Wigmore, Evidence § 2325 (McNaughton rev. ed. 1961).

This clearly supports the State's position that trial counsel's disclosure of the information waived whatever privilege may have existed. See also American Bar Association Section of Litigation, *The Attorney-Client Privi-*

*lege and the Work-Product Doctrine*, at 165 (3d ed. 1997) ("[a]lthough the client is the holder of the privilege, it is ordinarily the lawyer's obligation to claim the privilege on the client's behalf, even in the client's absence. Indeed, in most instances, it is through actions taken (or not taken) by counsel that courts find a waiver has occurred"). This court has previously allowed trial counsel to waive a client's privilege. See *People v. Newbury*, 53 Ill. 2d 228, 234-35 (1972) (attorney waived client's physician-patient privilege by questioning physician on direct examination). See also *People v. Kliner*, 185 Ill. 2d 81, 118 (1998) (in the course of litigation, "[a] defendant is bound by the acts or omissions of his counsel"); *cf. People v. Segoviano*, 189 Ill. 2d 228, 240 (2000) ("[t]he only trial-related decisions over which a defendant ultimately must have control are: whether to plead guilty; whether to waive a jury trial; whether to testify in his own behalf; whether to appeal; and whether to submit a lesser-included offense instruction").

All of the authorities upon which defendant relies refer to unauthorized or inadvertent disclosure. In this case defendant has not even argued that the disclosure by trial counsel to the expert witnesses was either unauthorized or inadvertent, and it was defendant's burden to so establish. *Golden Valley Microwave Foods, Inc. v. Weaver Popcorn, Inc.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990); *cf. United States v. Bump*, 605 F.2d 548, 551 (10th Cir. 1979).

Any attorney-client privilege which might have protected the conversations between defendant and attorney Gooch was waived by the disclosure of the statement to defendant's testifying expert witnesses. Accordingly, we need not reach the State's alternative arguments that the statements were not privileged and that any error in their admission was harmless.

II. Constitutionality of Defendant's Sentence

Defendant contends in the alternative that his sen-

tences must run concurrently, rather than consecutively. While this case was pending on appeal, the United States Supreme Court decided *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). This court allowed the parties to submit supplemental briefs on the constitutionality of defendant's consecutive sentence pursuant to section 5—8—4(b) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—4(b) (West 1994)) in the wake of *Apprendi.*

Before addressing its merits, the State contends that defendant has waived his argument by failing to raise it at trial, even though *Apprendi* was not decided until more than two years after defendant's trial. The State contends that the recent vintage of *Apprendi* is irrelevant because "the cases which were the precursors to *Apprendi* \*\*\* addressed the same general issue of enhanced penalties based upon facts presented at sentencing." The State further contends that defendant should not be allowed to rely upon the rule that a party may challenge the constitutionality of a statute at any time because "the statute under which defendant was sentenced has not been declared unconstitutional on its face. Therefore, the void ab initio [*sic*] doctrine \*\*\* is inapplicable. At worst, section 5—8—4(b) may be unconstitutional only *as applied to* a particular case, but the void ab initio [*sic*] doctrine has never been applied to such situations." (Emphasis in original.)

Defendant's argument is not waived. First, a party may challenge the constitutionality of a statute at any time. See, *e.g.*, *People v. Wright*, 194 Ill. 2d 1 (2000). We reject the State's argument, made without benefit of authority, that defendant falls outside of this rule because the statute "has not been declared unconstitutional on its face." The State appears to contend that a party may only challenge a statute which has *already* been declared facially unconstitutional. We decline to so hold.

Additional support for the conclusion that defendant has not waived the argument may be found in *People v. Williams*, 179 Ill. 2d 331 (1997). There, a defendant challenged on appeal a sentence imposed pursuant to a guilty plea. The State contended that defendant should be barred from challenging his sentence on appeal because he had not moved to withdraw his guilty plea in the trial court. We found the argument was not waived, because the defendant was arguing that the court had imposed a sentence for which it lacked statutory authority, rather than merely that his sentence was excessive. We held that the rule requiring a defendant to withdraw a guilty plea before arguing that a sentence was excessive would not "bar defendant's claim that his sentence was void because it does not conform with the statute." *Williams*, 179 Ill. 2d at 333. See also *People v. Wilson*, 181 Ill. 2d 409, 413 (1998) (defendant's argument that his sentence "violated statutory requirements" could be considered regardless of whether defendant had moved to withdraw his guilty plea).

Accordingly, we will address the merits of defendant's due process claim.

Section 5—8—4(b) of the Code allows the trial court to impose consecutive sentences in certain cases. At the time of defendant's offenses, it provided:

> "The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5—8—4(b) (West 1994).

The parties agree that the trial court imposed consecutive sentences on defendant pursuant to section 5—8—4(b), based on a finding that consecutive sentences were required to protect the public from defendant. Defendant

contends that his sentence is void because he was entitled, as a matter of due process, to have a jury, rather than the court, make this finding. He relies, as previously noted, on the Supreme Court's opinion in *Apprendi*.

In *Apprendi*, the Court considered three New Jersey statutes. One statute classified the possession of a firearm for an unlawful purpose as a "second degree" offense. Another statute provided that a second degree offense was punishable by imprisonment for "between five years and 10 years." A third statute, which the New Jersey Supreme Court labeled a "hate crime" statute, authorized an extended term of between 10 and 20 years' imprisonment for a second degree offense if the trial judge found by a preponderance of the evidence that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." The defendant was sentenced to 12 years' imprisonment for possession of a firearm because the trial court found that defendant had violated the hate crime statute.

The Court found that the "hate crime" statute violated due process. Specifically, the Court extended to state statutes its prior holding that in federal statutes " 'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 476, 147 L. Ed. 2d at 446, 120 S. Ct. at 2355, quoting *Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 326 n.6, 119 S. Ct. 1215, 1224 n.6 (1999). See also *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63 ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt").

The State contends that *Apprendi* does not apply to this case because no additional factual findings beyond the facts of defendant's convictions were required for defendant's sentences to be made consecutive. The State relies on section 9—3.1 of the Criminal Code, which defines the offense of concealment of homicidal death, the second of the two offenses of which defendant was convicted. Subsection (b) of that statute provides:

"Nothing in this Section prevents the defendant from also being charged with and tried for the first degree murder, second degree murder or involuntary manslaughter of the person whose death is concealed. If a person convicted under this Section is also convicted of first degree murder, second degree murder or involuntary manslaughter, the penalty under this Section shall be imposed separately and in addition to the penalty for first degree murder, second degree murder or involuntary manslaughter." 720 ILCS 5/9—3.1(b) (West 1994).

The State contends that the last sentence of this section requires the trial court to impose consecutive sentences when a defendant is convicted of both concealment of a homicidal death and first degree murder, second degree murder, or involuntary manslaughter. To construe the statute otherwise, the State contends, would render the phrase "in addition to" mere surplusage. Thus, the State argues, there is no *Apprendi* issue in this case because the trial court did not have to make any factual findings in order for the sentences to be consecutive.

We disagree. The State's position has been unanimously rejected by our appellate court, which has held that the "separately and in addition to" language is simply intended to clarify that a conviction for concealment of a homicidal death does not merge into a murder conviction. See, *e.g.*, *People v. Dover*, 312 Ill. App. 3d 790 (2000); *People v. Gil*, 125 Ill. App. 3d 892 (1984); *People v. Schlemm*, 82 Ill. App. 3d 639 (1980). We agree with this construction. As these cases have noted, section 5—8—4 of the Code of Corrections governs whether sen-

tences are to be served consecutively. Moreover, section 5—8—4 shows that the legislature uses the word "consecutive," rather than the more ambiguous phrase "in addition to," when it intends that the sentences be served consecutively. Although this construction can be understood as rendering the "in addition to" language redundant, we note that the legislature has twice amended section 9—3.1 since the decisions in *Gil* and *Schlemm* (see Pub. Act 84—1308, art. III, § 23, eff. August 25, 1986; Pub. Act 84—1450, § 2, eff. July 1, 1987), but has left intact the "separately and in addition to" language. "[T]his court presumes that the legislature knew of the prior interpretation placed on its language by judicial decision," and "[w]here terms used in a statute have acquired a settled meaning through judicial construction and are retained in subsequent amendments, they are to be understood as previously interpreted by the courts unless the legislature clearly indicates a contrary intention." *Carver v. Bond/Fayette/ Effingham Regional Board of School Trustees*, 146 Ill. 2d 347, 353 (1992). We find that section 9—3.1 does not mandate consecutive sentences.

However, we affirm defendant's sentence in this case. Our appellate court is sharply divided on the question of whether *Apprendi* concerns are raised by consecutive sentencing, where the sentences for the individual crimes remain within the statutory range. Compare *People v. Lucas*, 321 Ill. App. 3d 49, 53-54 (2001); *People v. Hayes*, 319 Ill. App. 3d 810, 820 (2001); *People v. Maiden*, 318 Ill. App. 3d 545, 550 (2001); *People v. Primm*, 319 Ill. App. 3d 411, 428 (2000); *People v. Sutherland*, 317 Ill. App. 3d 1117, 1131 (2000) (all finding section 5—8—4(a) of the Code constitutional and affirming defendants' consecutive sentences thereunder), with *People v. Mason*, 318 Ill. App. 3d 314, 320 (2000); *People v. Harden*, 318 Ill. App. 3d 425, 428 (2000); *People v. Waldrup*, 317 Ill.

App. 3d 288, 300 (2000); *People v. Carney*, 317 Ill. App. 3d 806, 813 (2000); *People v. Clifton*, 321 Ill. App. 3d 707, 727 (2000) (all finding section 5—8—4(a) unconstitutional and vacating consecutive nature of defendants' sentences thereunder). Those decisions which have struck down section 5—8—4(a) of the Code have focused on the fact that consecutive sentencing increases the actual amount of time a defendant will spend in jail, and reasoned that *Apprendi* commands that any fact which in reality increases the amount of time spent in jail should be submitted to a jury and proven beyond a reasonable doubt. The majority of the decisions upholding the statute have reasoned that *Apprendi* concerns are not raised unless "the [maximum] penalty for *a crime*" (emphasis added) (*Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63) is increased, and since consecutive sentences remain discrete sentences, none of the penalties for any individual crime has been increased.

Initially, we note that *Apprendi* explicitly disclaimed any holding regarding consecutive sentencing. There the State noted that defendant had pled guilty to two counts of unlawful possession of a firearm, as well as a single count of unlawful possession of an antipersonnel bomb. The State argued that defendant could have been given consecutive sentences on the two convictions for unlawful possession of a firearm, and thus received the same 12-year term of imprisonment as he in fact received on the single unlawful possession count under the hate crime statute. The Court refused to address this argument, stating:

"The constitutional question, however, is whether the 12-year sentence imposed on count 18 [the unlawful possession of a firearm count which was found to be a hate crime] was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased—indeed, it doubled—the maximum range within which the judge could

exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on [the other two convictions] have no more relevance to our disposition than the dismissal of [several other charges against the defendant]." *Apprendi*, 530 U.S. at 474, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354.

Thus, it is clear that the decisions holding that consecutive sentencing triggers *Apprendi* concerns are extending that case beyond its facts, as indeed the seminal case in that line acknowledged. See *Clifton*, 321 Ill. App. 3d at 725.

The decisions of our appellate court finding that consecutive sentencing does not raise *Apprendi* concerns are supported by the only reported United States circuit court decision on this topic. See *United States v. White*, 240 F.3d 127, 135 (2d Cir. February 13, 2001) ("[t]he district court's use of section 5G1.2(d) [of the United States Sentencing Guidelines to sentence defendant consecutively] did not result in a sentence on any one count above the maximum available on that count \*\*\* and so did not violate *Apprendi*"). Accord *United States v. Moreno*, No. S3 94 Cr. 0165 (S.D.N.Y. December 14, 2000) (holding that *Apprendi* ˌdid not prohibit consecutive sentencing even though court, not jury, made finding prerequisite to consecutive sentencing regarding quantity of drugs involved). See also *United States v. Henderson*, 105 F. Supp. 2d 523, 536-37 (S.D.W.V. 2000). Several other federal circuits have implicitly reached the same conclusion by finding no plain error in sentencing even though individual sentences exceeded the maximum allowable sentence based on the facts found by the jury—in violation of *Apprendi*—because on remand the sentences could be made consecutive to reach the same total sentence. See *United States v. Parolin*, 239 F.3d 922, 930 (7th Cir. 2001); *United States v. Sturgis*, 238 F.3d 956, 960 (8th Cir. 2001); *United States v. Page*, 232 F.3d 536 (6th Cir. 2000).

We find that *Apprendi* concerns are not implicated by consecutive sentencing. It is a settled rule in this state that sentences which run consecutively to each other are not transmuted thereby into a single sentence. *People v. Jones*, 168 Ill. 2d 367, 371-72 (1995); *People v. Kilpatrick*, 167 Ill. 2d 439, 446-47 (1995); *Thomas v. Greer*, 143 Ill. 2d 271, 278-79 (1991).[2] Because consecutive sentences remain discrete, a determination that sentences are to be served consecutively cannot run afoul of *Apprendi*, which only addresses sentences for individual crimes. Accordingly, section 5—8—4(b) of the Code passes constitutional muster.

We recognize that *Apprendi* contains isolated statements which on their face might appear to support the conclusion that the jury must find beyond a reasonable doubt each and every fact which might have any real-world impact on the length of time the defendant might spend in prison. For instance, the Court stated:

> "If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not—at the moment the State is put to proof of those circumstances—be deprived of protections that have, until that point, unquestionably attached." *Apprendi*, 530 U.S. at 484, 147 L. Ed. 2d at 451, 120 S. Ct. at 2359.

See also *Apprendi*, 530 U.S. at 494, 147 L. Ed. 2d at 457,

---

[2]Defendant contends that this court has "recognized that an order requiring a defendant to serve a sentence consecutively instead of concurrently 'was in a very real sense an increase in the length of his sentence,' " citing *Kilpatrick*, 167 Ill. 2d at 444. First, such a statement would have been *dictum*, because such an order was not before us in *Kilpatrick*. More importantly, this court did not make the statement to which defendant refers. We were merely quoting from an appellate court case, *People v. Muellner*, 70 Ill. App. 3d 671, 683 (1979), which had dealt with a different aspect of the statute under consideration. We did not adopt this statement.

120 S. Ct. at 2365 ("the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?").

However, these statements cannot be taken out of context. The issue in *Apprendi* was "whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for *an offense* from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." (Emphasis added.) *Apprendi*, 530 U.S. at 469, 147 L. Ed. 2d at 442, 120 S. Ct. at 2351. See also *Apprendi*, 530 U.S. at 490, 147 L. Ed. 2d at 455, 120 S. Ct. at 2362-63 ("[o]ther than the fact of a prior conviction, any fact that increases the penalty for *a crime* beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" (emphasis added)). The Court specifically stated that consecutive sentencing was "not relevant" to the "narrow issue" under consideration. *Apprendi*, 530 U.S. at 474, 147 L. Ed. 2d at 445, 120 S. Ct. at 2354.

We are bound to follow the United States Supreme Court's interpretation of the Constitution of the United States. *People v. Gersch*, 135 Ill. 2d 384, 398 (1990); *People v. Loftus*, 400 Ill. 432, 436 (1948). See also *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 4 L. Ed. 97 (1816). But we are not bound to extend the decisions of the Court to arenas which it did not purport to address, which indeed it specifically disavowed addressing, in order to find unconstitutional a law of this state. This is especially true where, as here, to do so would require us to overrule settled law in this state. See *Jones*, 168 Ill. 2d at 371-72; *Kilpatrick*, 167 Ill. 2d at 446-47; *Thomas*, 143 Ill. 2d at 278-79 (sentences retain their discrete character even if they are to be served consecutively). Each of defendant's individual sentences was within the statu-

288

tory range established by the legislature. This is all that *Apprendi* requires.

## CONCLUSION

For the reasons above stated, we affirm the judgment of the appellate court, which affirmed defendant's convictions and sentence.

*Affirmed.*