THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID SERGEANT, Defendant-Appellant.

First District (5th Division)   No. 1—99—1609

Opinion filed November 30, 2001.—Rehearing denied January 25, 2002.

Michael J. Pelletier and Tomas G. Gonzalez, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary L. Boland, and Linda Halperin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

Defendant, David Sergeant, was charged by indictment with multiple counts of murder, home invasion and armed robbery. Following a jury trial, where defendant and Dedric Hentz (codefendant) were simultaneously tried by separate juries, defendant was found guilty of murder, home invasion and armed robbery. Defendant was sentenced to a term of 60 years' imprisonment for murder, 30 years for home invasion to run concurrently and 30 years for armed robbery to run consecutively. Defendant now timely appeals.

On appeal, defendant argues that: (1) the trial court admitted inadmissible hearsay; (2) he was denied effective assistance of counsel; and (3) his sentence for armed robbery should be modified to run concurrently because the armed robbery did not result in severe bodily

injury or, alternatively, because it violates *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

For the following reasons, we affirm defendant's conviction and affirm his sentence for first degree murder, modify his sentence for armed robbery to run concurrently, and remand to the trial court to enter a consecutive sentence on the home invasion conviction.

## I. BACKGROUND

At the defendant's trial, Assistant State's Attorney Mike Rogers testified that, in October of 1995, he became involved in the investigation of the homicide of Scott Tisdale. Rogers stated that upon belief that defendant was involved in this case, he went to the Indiana Department of Corrections' Regional Diagnostic Center in Plainfield, Indiana, on October 30, 1996, to interview the defendant. Rogers testified that he apprised defendant of his *Miranda* rights. Rogers testified that defendant agreed to talk to him and he wrote out defendant's statement. The statement included the following information:

"Defendant explained that one of his co-defendants introduced him to Loracio Jennings. Defendant stated that Jennings was the head of a home invasion crew that he intended to join. Defendant was informed that everything that he and the crew took out of a 'lick' or 'job' was to be brought to Jennings. Defendant stated that on October 6, 1995 the crew met at Jennings['] apartment and planned two 'licks' for that evening. The first 'lick' was supposed to be at 73rd and South Shore Drive, the second was planned for 93rd and Jeffrey. Defendant stated that he was told that at the second 'lick' he or another man would knock on the door and pretend they were buying dope, and then just go in with a Tech 9 weapon, while two of the co-defendants would tie the people up. Defendant stated that after arriving at the first 'lick', the crew was unable to get into the apartment and it was called off. The crew then went to 93rd and Jeffrey. When defendant and the two men went to the door, the victim opened the door and defendant backed him into the house with a Tech 9. The victim was told to get down on the ground and Joiner tied him up. At this point defendant stated that an old man came up the stairs and Joiner tied him up as well. Defendant stated that he guarded the two men while the others searched the house. Defendant stated that Hentz then took the Tech 9 while defendant went to search the house. During his search defendant found a loaded pump shotgun under a bed. Defendant stated that he ran downstairs and out to the back yard yelling 'I found a gun, I found a gun'. At this point defendant said he saw the victim and Hentz 'tussling' over the Tech 9 so he hit the victim with the butt part of the shotgun. Defendant said as they struggled for the weapons,

Hentz grabbed the shotgun and he grabbed the Tech 9. Defendant stated that Hentz then poked the victim with the shotgun and the gun went off twice. The victim grabbed his side. Defendant stated that he and Hentz ran to the car and proceeded back to Jennings [sic] apartment. Defendant got 10-15 bags of crack for the job."

Rogers further testified that the defendant reviewed the statement, made corrections, initialed these corrections and signed the statement. At the end of the statement defendant acknowledged that initially he had said he didn't know anything about "jobs" and "licks," but he figured that Jennings was going to "hang him out" and he did not want to "go down" alone.

Lori Bethany testified that during October 1995 she was the girlfriend of Michael Perkins. She stated that on October 6, 1995, she and Perkins went to Loracio Jennings' apartment at around 6 p.m. Bethany testified that the defendant, codefendant Dedric Hentz, Michael Joiner, Loracio Jennings and Jerry were all present at the apartment that night. Bethany testified that Perkins instructed her to go into the kitchen with Jerry while Perkins, defendant, Hentz, Joiner and Jennings all went into Jennings' bedroom, where they remained for 15 minutes.

Bethany testified that when they left the apartment, she, Perkins and Jennings got into a Blazer while defendant, Hentz and Joiner got into a white Buick. The cars drove to around 77th or 78th and South Shore Drive. She was instructed to wait in the car while the men all got out of the cars and went into the building. After 10 minutes, the men got back into the cars and proceeded to 93rd and Jeffrey. Bethany testified during direct and cross-examination that she never inquired as to where they were going or why. When they arrived, the Buick pulled up next to the Blazer and Jennings handed money to someone in that car. Bethany stated that the three men in the Buick exited the car and went toward 9320 S. Jeffrey. She did not actually see the men enter the house because the Blazer she was in went around the block. Bethany testified that the Blazer parked one block away, where they could see the white Buick. Shortly after, Bethany heard two gunshots coming from the area of 93rd and Jeffrey. Bethany saw defendant, Hentz, and Joiner come running from an alley to the Buick. At that point the Blazer she was riding in began to drive away. Both cars returned to Jennings' apartment.

At Jennings' apartment, Bethany was again instructed to go into the kitchen while defendant, Jennings, Perkins, Joiner and Hentz went into the bedroom and shut the door. After the men exited the bedroom, approximately 10 minutes later, they began to smoke cocaine. When Bethany inquired as to where the drugs had come from, Hentz

replied "from the move." Defendant was not present for this statement. Bethany testified that she understood this to mean "the move that just transpired." Bethany stated that she and Perkins then left Jennings' apartment and stayed at a motel for the evening. On direct examination Bethany testified that after having a conversation with Perkins at the motel she believed a robbery had occurred at 9320 S. Jeffrey.

Bethany testified that the first time she spoke with the police was on the evening of October 10, 1995, when Detectives William Foster and Ed O'Boyle arrived at her house. Bethany stated Perkins had just pulled up to her house when the detectives arrived. Bethany testified that she went to Area 2 with the officers to tell them what she knew. The detectives also took Perkins to Area 2. Bethany also stated that she accompanied the officers to point out the location of Jennings' apartment at 68th and Clyde. On the way back from the apartment, Bethany saw Hentz walking westbound on 67th Street and she pointed him out to the officers.

Bethany was taken back to Area 2, where she provided a written statement at approximately 5 p.m. on October 11, 1995. Bethany remained at Area 2 until the morning of October 12, 1995, when she testified before the grand jury. On cross-examination, Bethany admitted that during the month of October 1995 she was a frequent drug user and Perkins was her drug supplier.

Adrienne Segovia, a forensic pathologist, testified that on October 7, 1995, she performed an autopsy on Scott Tisdale. Segovia concluded after her examination that Tisdale died as a result of a close-range shotgun wound to the abdomen.

Detective William Foster testified that on October 6, 1995, at approximately 8 p.m., he received a call on his radio that a man was shot at 9320 South Jeffrey and proceeded to the scene. While canvassing the neighborhood, Foster received the names Loracio Polk and Perkins from Larry Williams. Foster later learned that the two men were Loracio Jennings and Michael Perkins. Foster testified that he was unable to locate these men on the night of the incident.

Foster testified that on October 9, 1995, he learned that Perkins had a girlfriend, Lori Bethany, who lived at 11717 Longwood Drive. Late the next evening, Foster located Perkins and Bethany at Bethany's residence and brought them both to Area 2. Later, Bethany accompanied Foster to point out Jennings' apartment. Foster testified that although they were unable to locate Jennings that night, Bethany pointed out Hentz on a sidewalk on 67th Street. At that point Hentz was taken into custody and Bethany was taken back to Area 2.

Finally, the State called James Tisdale. Tisdale testified that on

October 6, 1995, he lived at his home at 9320 S. Jeffrey with his son, Scott Tisdale. Tisdale stated that on that evening at around 8 p.m. he was downstairs watching television in the lower "rec room" when he heard a commotion at the top of the stairs. He heard a voice say that it was the police and to come upstairs. When Tisdale was at the stairs, he saw an arm holding a machine pistol. He walked up the stairs and was tied up and forced to lie on the floor. Tisdale stated that he saw his son also lying on the floor. Tisdale admitted that it was dark and he could not see the face of the man with the machine pistol. Tisdale did state that he saw a man standing over his son holding a bat and wearing a long dark coat. Tisdale identified the defendant in court as the man with the bat.

Tisdale testified that after a few moments defendant went out of his sight, he heard people upstairs, then someone took his son out of the room. Tisdale stated that someone came up behind him and took his gold chain from around his neck. He then heard someone yelling that they found a shotgun. He then heard the back door, which leads out to the garage, open. A few minutes later Tisdale heard gunshots coming from the direction of the garage. He also heard his son grunt. After hearing people run out of the house, Tisdale untied himself and ran out the back door where he saw his son lying facedown on the sidewalk.

Tisdale testified that on October 25, 1996, he was shown a series of photographs and he recognized one of the photographs as being that of the man who stood over his son with the bat. Tisdale identified defendant in court as the man in the photograph. Tisdale testified that on April 23, 1997, he went to Area 2 and viewed a lineup where he recognized the man who stood over his son with the bat. Tisdale identified defendant in court as the man he picked out of the lineup.

Anthony Miles testified for the defense that he had known defendant for over 12 years. Miles stated that defendant would visit and often stay at his home for a few days at a time to assist him because he was disabled. Miles stated that on October 6, 1995, defendant came to stay with him at 66th and Ingleside. Miles stated that it was the middle of the night when defendant arrived but he did not know the exact time. Miles stated that defendant stayed a few days.

Defendant then took the stand. Defendant testified that on October 6, 1995, he went to Anthony Miles' house at around 6:30 p.m. and stayed there all weekend. Defendant admitted that he was convicted of felonies in 1992 and 1996. Defendant further testified that on October 30, 1996, he was incarcerated at the Regional Diagnostic Center and that Assistant State's Attorney Rogers and two detectives came to see him there. Defendant testified that the officers

inquired about a shooting and he told them he did not know anything about it. He stated that while the officers continued to question him, Rogers was writing something. Defendant testified that he continued to tell the police that he didn't know anything. Defendant stated that Rogers told him that if he helped finger Jennings for conspiracy nothing would happen to him. On cross-examination defendant admitted to knowing Jennings, Hentz, Perkins and Joiner. Defendant denied ever hearing the term "lick" or "job." He admitted that he signed the statement but denied having read it.

After closing arguments, the jury found defendant guilty of the first degree murder of Scott Tisdale, home invasion with Scott Tisdale as the victim, home invasion with James Tisdale as the victim, and the armed robbery of James Tisdale. The court sentenced defendant to 60 years in prison for murder, 30 years for armed robbery to run consecutively, and 30 years on the home invasion counts to run concurrently, which the court "merged."

## II. ANALYSIS

### A. HEARSAY

Defendant first argues that he was denied a fair trial where the court improperly allowed the hearsay testimony of Bethany. Specifically, defendant points to the following exchanges:

"Q. Now after you saw those individuals smoke their packets, did you ask any of them any questions about where they got the narcotics?

A. Yes I did.

Q. Who did you ask?

A. I remember asking Dedric.

Q. And did Dedric provide a response?

A. He said they got it from a move.

Q. When he said move, what did you understand that to mean?

A. The move that just transpired."

And, later during the examination:

"Q. Did you have conversation [with Perkins], don't tell me what he said: Did you have a conversation?

A. I'm sorry. I had a conversation.

Q. After having the conversation, what did you believe transpired at that house?

A. I believed that a robbery had transpired at that house."

Defendant maintains that the elicited testimony was hearsay because it was offered to prove the State's theory that defendant was involved in the home invasion.

■ Defendant failed to properly preserve this issue for appeal. We

hold that the defendant has waived this issue as the defendant failed to object to the comments at trial and the issue was not included in his posttrial motion. *People v. Parker*, 311 Ill. App. 3d 80, 91, 724 N.E.2d 203 (1999), citing *People v. Enoch*, 122 Ill. 2d 176, 187, 522 N.E.2d 1124 (1988). The waiver rule serves an important purpose because a timely objection will allow the circuit court to correct any errors and "a party who fails to object cannot obtain the advantage of receiving a reversal by failing to act." *People v. Reid*, 136 Ill. 2d 27, 38, 554 N.E.2d 174 (1990).

Even if we considered defendant's argument that the statements were improperly admitted hearsay, any error in this regard was harmless. "This court has previously stated that the admission of hearsay is not reversible error if there is no reasonable probability that the jury would have acquitted the defendant if the hearsay testimony had been excluded, such as where properly admitted evidence proves the same matter or there is overwhelming evidence of the defendant's guilt." *People v. Rodriguez*, 291 Ill. App. 3d 55, 61, 684 N.E.2d 128 (1997).

The evidence in this case is overwhelming. Defendant confessed to his involvement in the armed robbery and home invasion in a written statement. Lori Bethany testified to being with the defendant at the address where the murder and armed robbery occurred that evening. James Tisdale identified the defendant as one of the invaders from a photograph, in a lineup and in court. Defendant's apparent alibi witness testified that defendant came to his house on October 6, 1995, but he could not remember at what time. When defendant took the stand, he testified that while he signed and initialed every page of the statement, he did not read any of it. Additionally, the evidence that defendant complains of was introduced to the jury through properly admitted evidence. Here, James Tisdale testified that an armed robbery occurred and defendant confessed that there was an armed robbery. Therefore, even if the statements were improperly admitted, their effect on the jury was minimal in light of the overwhelming evidence supporting defendant's conviction.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant claims that he was denied effective assistance of counsel where counsel questioned the defendant about a felony conviction after the trial court had barred its admission. Specifically, defendant maintains that after successfully moving to bar the admission of defendant's felony conviction in 1992, counsel opened the door for the State to introduce a certified copy of this conviction. Defendant alleges the following exchange between defense counsel and himself allowed the jury to doubt his credibility:

"Q. Now, sir, as you sit here today have you ever been convicted of a crime?

A. Yes, I have.

Q. And in 1992 were you convicted of a felony?

A. Yes, I was.

Q. 1994 were you convicted of a felony?

A. No.

Q. Strike that. 1994 were you convicted of a felony?

A. That is the same one from 1992. That's the same case.

Q. 1996 conviction for a felony?

A. Yes.

Q. Two convictions for felonies?

A. Yes."

■ In reviewing a claim for ineffective assistance of counsel, we must inquire whether defense counsel's performance was deficient and whether any deficiencies prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Defense counsel's assistance was ineffective if the representation fell below an objective standard of reasonableness and if there is a reasonable probability that the outcome of the trial would have differed but for defense counsel's errors. *People v. McKenzie*, 263 Ill. App. 3d 2d 716, 721, 635 N.E.2d 903 (1994).

During the hearing on the motion *in limine* to bar the defendant's prior convictions, the court stated:

"What I am going to do, State, is I will let in the 1994 Possession of a Controlled Substance with intent to deliver. I will let in the 1996 simple robbery. I will preclude the 1992 straight possession.

Now what I will do as well is I will let the State indicate that [in] 1992 you have been convicted of a felony without regard to the sentence nor the events."

Defendant maintains that this ruling limited the admission of the 1992 conviction to allow only the fact that it was a conviction and therefore it was objectively unreasonable for defense counsel to elicit testimony from the defendant regarding the 1992 conviction. We disagree.

■ It was a sound trial strategy for defense counsel to choose to front the convictions. "[F]aced with the prospect that defendant would be impeached with the prior conviction if he testified, it was reasonable strategy to inform the jury 'up front' in anticipation of defendant's testimony. This is a common enough strategy, and one which would justify the introduction of the prior conviction." *People v. Anderson*, 272 Ill. App. 3d 566, 570, 653 N.E.2d 395 (1995). Counsel merely posited to the defendant, "[I]n 1992 were you convicted of a felony?" It was defendant himself, not defense counsel, who chose at this point,

rather than admitting that he had three separate felony convictions, to claim that he only had two convictions. As the trial court stated when defense counsel objected to the State's introduction of certified copies of defendant's separate 1992 and 1994 convictions in rebuttal:

> "The defendant took the stand and said 199—mentioned two, and 1994, one in the same counselor. You have no control over what your client said, what he said from the stand, but it is fair rebuttal because the inference is that—the inference is that these are one in the same. [*sic*]. He did that."

From the trial court's ruling, it appears that it was allowing the State to put all three of defendant's convictions before the jury. Even if defendant took the ruling to mean that the court was only allowing rebuttal evidence as to two convictions, defendant could not use this ruling as a basis to falsely testify that he only had two convictions. Therefore, defense counsel's question regarding defendant's 1992 conviction was not objectively unreasonable.

## C. CONSECUTIVE SENTENCE

Defendant argues that the court's ruling that his 30-year consecutive sentence for armed robbery should be modified to run concurrently. In support of his argument, defendant relies upon an interpretation of section 5—8—4(a) of the Unified Code of Corrections (the Code) (730 ILCS 5/5—8—4(a) (West 1996)) and the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348.

We first address defendant's argument that his consecutive sentence violated the tenets of *Apprendi*. Our supreme court addressed whether *Apprendi* is applicable to section 5—8—4(a) in *People v. Carney*, 196 Ill. 2d 518 (2001). There, the defendant was charged with intentional murder and felony murder based on a charge of armed robbery. The jury returned a verdict of guilty of armed robbery and a general verdict of guilty of first degree murder. The trial court sentenced the defendant to 29 years on murder and 10 years on armed robbery, with the sentences to run consecutively. This court reversed the consecutive nature of the sentence as being violative of the holding in *Apprendi. People v. Carney*, 317 Ill. App. 3d 806, 740 N.E.2d 435 (2000). Our supreme court reversed this aspect of our holding. "[W]e hold that consecutive sentences imposed under section 5—8—4(a) of the Code do not violate the due process rights of defendants and that the Supreme Court's *Apprendi* decision does not apply to such sentences." *Carney*, 196 Ill. 2d at 536. This is because "[c]onsecutive sentences do not expose a defendant to punishment exceeding the statutory maximum for each conviction." *Carney*, 196 Ill. 2d at 536. We hold that as both of defendant's individual sentences were within the

statutory range established by the legislature, the sentences do not violate *Apprendi*. *People v. Wagener*, 196 Ill. 2d 269, 283-84 (2001).

We turn next to defendant's argument that his consecutive sentences violate section 5—8—4(a) of the Unified Code of Corrections (730 ILCS 5/5—8—4(a) (West 1994)). The applicable sentencing scheme in effect at the time the offenses were committed, provided in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 [criminal sexual assault] or 12—14 [aggravated criminal sexual assault] of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court." 730 ILCS 5/5—8—4(a) (West 1994).

This section was recently interpreted by our supreme court in *People v. Whitney*, 188 Ill. 2d 91, 720 N.E.2d 225 (1999). In *Whitney*, the defendant was convicted of first degree murder of one victim and aggravated discharge of a firearm against a second victim, who suffered no injury. The trial court sentenced the defendant to consecutive terms of imprisonment and the appellate court reversed, holding: "First degree murder, while obviously satisfying the 'severe bodily injury' requirement of section 5—8—4, is not a Class X or Class 1 felony under the Code." *People v. Whitney*, 297 Ill. App. 3d 965, 968, 720 N.E.2d 225 (1998).

The supreme court affirmed the appellate court, holding:

> "[W]e construe the first exception under section 5—8—4(a) as requiring consecutive sentencing where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury during the commission of *that* felony. ***
>
> ***
>
> *** First degree murder is not a Class X or Class 1 felony; rather, it is its own class of felony. 730 ILCS 5/5—5—1(b) (West 1994). Aggravated discharge of a firearm is a Class 1 felony. 720 ILCS 5/24—1.2(a)(2), (b) (West 1994). Defendant's conduct however, in committing the offense of aggravated discharge of a firearm did not result in severe bodily injury to the victim of that felony, Theodore Macklin. We therefore hold that the requirements for the first exception under section 5—8—4(a) have not been satisfied." (Emphasis added). *Whitney*, 188 Ill. 2d at 98-100.

Here, defendant was convicted of the first degree murder of Scott Tisdale, two counts of home invasion, one with Scott Tisdale as the victim and one with James Tisdale as the victim, and one count of armed robbery with James Tisdale as the victim. The trial court sentenced defendant to 60 years for first degree murder, a consecutive 30-year sentence for the armed robbery of James Tisdale, and a concurrent 30-year sentence for home invasion.

Defendant maintains that the incidents that occurred on October 6 were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal act. Specifically, defendant alleges that because the offenses were part of a single course of conduct, under section 5—8—4(a), the imposition of a consecutive sentence was improper because the armed robbery did not result in severe bodily injury to James Tisdale. Applying the holding of *Whitney*, as James Tisdale did not suffer severe bodily injury, defendant's conviction for the armed robbery of James cannot trigger a consecutive sentence pursuant to section 5—8—4(a).

The State argues that defendant's consecutive sentences may be upheld based on section 5—8—4(b) of the Code. At the time that the offenses were committed, that section read:

> "The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5—8—4(b) (West 1994).

However, before a court may consider consecutive sentences under section 5—8—4(b), the court must first determine whether section 5—8—4(a) applies. By its language, section 5—8—4(a) applies to all offenses that arise out of a single course of conduct. This was recognized by the court in *Whitney* when it held:

> "There is no dispute that defendant committed these crimes as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. Consequently, defendant is subject to consecutive sentences *only* if either of the exceptions set forth in section 5—8—4(a) are applicable." (Emphasis added). *People v. Whitney*, 188 Ill. 2d at 99.

■ It is important to note that, as a general rule, when multiple offenses are committed in a single course of conduct, consecutive sentences are prohibited. The exceptions to this general rule were discussed by our supreme court in *People v. Curry*, 178 Ill. 2d 509, 687 N.E.2d 877 (1997):

"This court has determined that section 5—8—4(a) creates two exceptions to the general rule that consecutive sentences may not be imposed for multiple offenses which occur as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. The first exception occurs when one of the multiple offenses is a Class X or Class 1 felony and severe bodily injury is inflicted; the second exception occurs when one of the multiple offenses is a violation of section 12—13 (criminal sexual assault) or 12—14 (aggravated criminal sexual assault) of the Criminal Code of 1961. When a defendant's convictions bring him within either of these two exceptions, the mandatory consecutive sentencing provision of section 5—8—4(a) is triggered and consecutive sentences must be imposed." *People v. Curry*, 178 Ill. 2d at 519-20.

The court also explained on which charges the trial courts were to impose consecutive sentences under section 5—8—4(a) and how these sentences were to be served:

"The triggering offenses listed in section 5—8—4(a) are crimes of a singular nature, involving 'particularly serious invasions of the person.' [Citations.] By enacting the mandatory consecutive sentencing provision of section 5—8—4(a), the legislature sought to punish the commission of triggering offenses more harshly than the commission of other crimes. [Citation.] This legislative intent would be defeated if the triggering and nontriggering offenses were treated in a like manner. Accordingly, we hold that consecutive sentences are mandatory only for those offenses which trigger the application of section 5—8—4(a). [Citations.]

\*\*\* Consequently, section 5—8—4(a) must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses. Sentences for multiple nontriggering offenses may be served concurrently to one another after any consecutive sentences for triggering offenses have been discharged. [Citations.]" *People v. Curry*, 178 Ill. 2d at 538-39.

If multiple convictions arise out of a single course of conduct, and one or more of those convictions is for a triggering offense, section 5—8—4(a) *requires* that any sentence for the triggering offense or offenses be served consecutively to any sentence imposed for nontriggering offenses. *People v. Curry*, 178 Ill. 2d at 538-39. However, if multiple convictions arise out of a single course of conduct, and none of those convictions is for a triggering offense, section 5—8—4(a) *prohibits* consecutive sentences. *People v. Whitney*, 188 Ill. 2d at 99; *People v. Daniel*, 311 Ill. App. 3d 276, 287, 723 N.E.2d 1279 (2000); *People v. Kagan*, 283 Ill. App. 3d 212, 220, 669 N.E.2d 1239 (1996).

Further, if consecutive sentences are prohibited by section 5—8—4(a), then they cannot be imposed under section 5—8—4(b). *People v. Kagan*, 283 Ill. App. 3d at 223; *People v. Fritz*, 225 Ill. App. 3d 624, 628, 588 N.E.2d 307 (1992). This is because subsection (b) does not provide an additional basis to impose consecutive sentences when the multiple convictions arise out of a single course of conduct; rather, it requires the sentencing court to make a specific finding if it wishes to impose consecutive sentences in a case where the court has the discretion to do so. *People v. Kagan*, 283 Ill. App. 3d at 223. Sentencing courts have no discretion under section 5—8—4(a). They are required to impose consecutive sentences on all triggering offenses arising out of a single course of conduct, and they are prohibited from imposing consecutive sentences on nontriggering offenses arising out of a single course of conduct.

Prior to July 22, 1997, section 5—8—4(b) gave the trial court the discretion to impose consecutive sentences on *any* crime not committed in a single course of conduct if the court made a finding that such sentences were necessary to protect the public. *People v. Cooper*, 239 Ill. App. 3d 336, 359, 606 N.E.2d 705 (1992).

This version of section 5—8—4(b) was in effect at the time the instant offenses were committed; therefore, the trial court had discretion to impose consecutive sentences on the defendant if the offenses were committed in separate courses of conduct and the trial court made a specific finding that such sentences were necessary to protect the public. As section 5—8—4(b) only applies to offenses that were committed in separate courses of conduct, we must first determine if the instant offenses were committed in a single course or separate courses of conduct.

In *People v. Bell*, 196 Ill. 2d 343, 348, 751 N.E.2d 1143, 1146 (2001), our supreme court held:

"[G]enerally, under section 5—8—4(a) consecutive sentences will not be imposed where a defendant commits offenses that were part of a 'single course of conduct during which there was no substantial change in the nature of the criminal objective.' [Citation.] This test is frequently referred to as the 'independent motivation' test. See, *e.g.*, *People v. Kagan*, 283 Ill. App. 3d 212, 220 (1996); *People v. Fritz*, 225 Ill. App. 3d 624, 629 (1992); *People v. Harris*, 220 Ill. App. 3d 31, 32 (1991); *People v. Ingram*, 84 Ill. App. 3d 495, 498 (1980); *People v. Siglar*, 18 Ill. App. 3d 381, 383 (1974)."

In adopting the "independent motivation" test to determine whether offenses were part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, the court in *Bell* did not really explain how courts are to apply the independent motivation test.

This issue was also recently discussed and interpreted in *People v. Daniel*, 311 Ill. App. 3d at 286-87. There, the court held:

"[W]e believe that the language 'during which there was no substantial change in the nature of the criminal objective' is meant to limit instead of define the language 'single course of conduct.' Thus, we hold that section 5—8—4(a) applies only to those offenses committed during a single course of conduct that is guided by an ' "overarching criminal objective." ' See *People v. Kagan*, 283 Ill. App. 3d 212, 220 (1996), quoting *People v. Fritz*, 225 Ill. App. 3d 624, 629 (1992). In other words, if the acts constituting the course of conduct were independently motivated, section 5—8—4(a) is inapplicable.

Thus, we must determine whether the trial court properly concluded that defendant's actions in this case constituted a single course of conduct. In doing so we must examine whether the motivation to commit the aggravated criminal sexual assault was independent of the motivation to commit the aggravated robbery, or whether both were guided by an 'overarching criminal objective.'

The term 'conduct' is defined in the Criminal Code as 'an act or a series of acts, and the accompanying mental state.' 720 ILCS 5/2—4 (West 1994). A 'course of conduct' is not necessarily confined to a single incident but may encompass a range of activity. [*People v.*] *Bole*, 155 Ill. 2d [188,] 193 [(1993)]. The term 'objective' means 'something toward which effort is directed.' Webster's Third New International Dictionary 1556 (1993). Thus, an 'overarching objective' is a broad goal toward which individual acts are directed." *People v. Daniel*, 311 Ill. App. 3d at 286-87.

■ The determination of whether a defendant's actions constituted a single course of conduct is a question of fact for the trial court to determine. *People v. Edwards*, 259 Ill. App. 3d 151, 156, 630 N.E.2d 1266 (1994). Therefore, we defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence. *People v. Daniel*, 311 Ill. App. 3d at 287.

In this case, the trial court did not make a finding as to whether the offenses committed on October 6, 1995, of which defendant was convicted, arose out of a single course of conduct. Consequently, we must remand this case to the trial court. In doing so, we direct the trial court to first determine whether the armed robbery of James Tisdale, the home invasion of both James and Scott Tisdale, and the murder of Scott Tisdale were committed in a single course of conduct during which there was no substantial change in the nature of the criminal objective.

The court must then determine whether the defendant inflicted

severe bodily injury during the commission of any of the Class X felonies that were committed in a single course of conduct. We note that it is uncontested that James Tisdale was not injured during the armed robbery or home invasion. Consequently, if the court determines that these offenses occurred in a single course of conduct, the trial court may not impose consecutive sentences on defendant for either of these offenses under either section 5—8—4(a) (see *People v. Whitney*, 188 Ill. 2d at 100) or under section 5—8—4(b) (see *People v. Kagan*, 283 Ill. App. 3d at 220).

If on remand the trial court determines that the home invasion and murder of Scott Tisdale occurred in a single course of conduct, the court must then determine whether defendant inflicted severe bodily injury upon Scott Tisdale during the commission of the home invasion. If the court finds both of these factors to be present, the court must impose a sentence on the Class X offense of home invasion, consecutive to the sentence for first degree murder.

In *People v. Arna*, 168 Ill. 2d 107, 112, 658 N.E.2d 445 (1995), our supreme court held that when the provisions of section 5—8—4(a) have been met, imposition of consecutive sentences is mandatory. The court held that the imposition of a concurrent sentence in violation of section 5—8—4(a) is void and subject to a reviewing court's remand for imposition of the required consecutive sentence. *Arna*, 168 Ill. 2d at 113.

We must next determine whether the first degree murder of Scott Tisdale satisfies the severe bodily injury requirement. In *People v. Hill*, 294 Ill. App. 3d 962, 691 N.E.2d 797 (1998), this court affirmed the sentence of a defendant who had been sentenced to natural life for first degree murder, to a 60-year consecutive term for home invasion and to a 30-year consecutive term for armed robbery. This court reduced the sentence for home invasion to 30 years under *People v. Young*, 124 Ill. 2d 147, 529 N.E.2d 497 (1988), but affirmed the consecutive sentences for both the home invasion and armed robbery of the single victim. The court also rejected the defendant's argument on appeal that he did not use a weapon when he took the victim's property. "[A]s long as there is some concurrence between the defendant's threat of force and the taking of the victim's property, a conviction for armed robbery is proper. [*People v.*] *Lewis*, 165 Ill. 2d [305], 339 [(1995)]; *People v. Strickland*, 154 Ill. 2d 489, 524, 609 N.E.2d 1366 (1992); *People v. Wilson*, 254 Ill. App. 3d 1020, 1059, 626 N.E.2d 1282 (1993). Furthermore, convictions for armed robbery will be upheld on review when the defendant's use of threat or force and the taking are found to be a series of continuous acts. [Citations.]" *People v. Hill*, 294 Ill. App. 3d at 971.

In *People v. Moreland*, 292 Ill. App. 3d 616, 686 N.E.2d 597 (1997), *appeal denied*, 179 Ill. 2d 606 (1998), this court affirmed the defendant's convictions for murder, armed robbery and aggravated kidnaping with sentences of 60 years for murder, 30 years on armed robbery to run consecutively and 15 years on the aggravated kidnaping to run concurrently. In affirming the sentences, the court cited section 5—8—4(a) and *People v. Curry*, 178 Ill. 2d 509, 687 N.E.2d 877 (1997). The appellate court affirmed the trial court's finding that the severe bodily injury to the single victim did not "arise from" the act of the kidnaping, citing *People v. Medrano*, 282 Ill. App. 3d 887, 669 N.E.2d 114 (1996).

The appellate court in *Whitney* held that first degree murder "obviously satisf[ied] the 'severe bodily injury' requirement of section 5—8—4." *People v. Whitney*, 297 Ill. App. 3d at 968. The supreme court's holding in *Whitney* also supports the proposition that the murder of the victim of a triggering offense fulfills the "severe bodily injury" requirement of section 5—8—4(a). In affirming the appellate court, the supreme court in *Whitney* said: "We disagree that *only* Class X or Class 1 felonies where severe bodily injury is an inherent factor trigger consecutive sentences under section 5—8—4(a). Instead, *any* Class X or Class 1 felony that results in severe bodily injury being inflicted on the victim of that felony triggers consecutive sentences." (Emphasis added.) *Whitney*, 188 Ill. 2d at 99. Based on this language, the murder of the victim of a "triggering offense" may provide the basis for a finding of severe bodily injury for purposes of section 5—8—4(a).

In determining what relationship must exist between the triggering offense and the severe bodily injury, the supreme court in *Whitney* first reviewed the defendant's position on appeal. In doing so, the court specifically referred to cases holding that "the severe bodily injury requirement of section 5—8—4(a) must be *proximately connected* to the Class X or Class 1 felony for it to be a triggering offense." (Emphasis added.) *People v. Whitney*, 188 Ill. 2d at 96, citing *People v. Medrano*, 282 Ill. App. 3d 887, 896-97, 669 N.E.2d 114 (1996), and *People v. Toliver*, 251 Ill. App. 3d 1092, 1099-1100, 623 N.E.2d 880 (1993). The court held: "[W]e construe the first exception under section 5—8—4(a) as requiring consecutive sentencing where the defendant has been convicted of either a Class X or Class 1 felony and where he had inflicted severe bodily injury *during the commission of that felony*." (Emphasis added.) *People v. Whitney*, 188 Ill. 2d at 98-99.

We stress that in determining whether to impose consecutive sentences in a given case, the trial court must make factual determinations as to each of the factors required by section 5—8—4 and by

cases interpreting that section. The first issue to be decided is whether the multiple offenses of which the defendant is convicted were committed in a single course of conduct. If so, section 5—8—4(a) applies and consecutive sentences are mandatory, but they may only be imposed on "those offenses which trigger the application of section 5—8—4(a)." *People v. Curry*, 178 Ill. 2d at 538. Consequently, trial courts must also determine whether a given offense is a triggering offense. Since 1988, section 5—8—4(a)(i) has required consecutive sentences for Class X or Class 1 felonies during the commission of which the defendant inflicted severe bodily injury. *People v. Whitney*, 188 Ill. 2d at 99. Section 5—8—4(a)(ii) has required consecutive sentencing for convictions of criminal sexual assault and aggravated criminal sexual assault since 1988. Effective January 1, 2000, first degree murder and many charges of armed violence were added as triggering offenses. If the offenses were committed in a single course of conduct and none of them qualify as triggering offenses, section 5—8—4(a) prohibits consecutive sentencing. *People v. Whitney*, 188 Ill. 2d at 100.

If the trial court determines that the offenses were not committed in a single course of conduct, consecutive sentences may only be imposed under section 5—8—4(b). Prior to July 22, 1997, section 5—8—4(b) gave the trial court the discretion to impose consecutive sentences on *any* crime not committed in a single course of conduct if the court made a finding that such sentences were necessary to protect the public. This is the section that may be applicable in the instant case.

We note that, effective July 22, 1997, section 5—8—4(b) was amended to require consecutive sentences on triggering offenses that were not committed in a single course of conduct. *People ex rel. Waller v. McKoski*, 195 Ill. 2d 393 (2001); *People v. Conley*, 306 Ill. App. 3d 1, 11 (1999). The triggering offenses enumerated in section 5—8—4(b) are identical to those set out in section 5—8—4(a). Thus, the 1997 amendment had the practical effect of requiring consecutive sentences on all triggering offenses, whether they were committed in a single course of conduct or separate courses of conduct. After July 22, 1997, if the crimes were not committed in a single course of conduct and none of them qualify as triggering offenses, section 5—8—4(b) gives the trial court discretion to impose a consecutive sentence if it makes a finding that consecutive sentences are necessary to protect the public. *People v. Stacey*, 193 Ill. 2d 203, 211 (2000).

For the foregoing reasons, we affirm defendant's convictions for murder, home invasion and armed robbery and defendant's sentence for first degree murder. We vacate defendant's sentences for armed robbery and home invasion, and we remand this matter to the trial

court for resentencing on those charges, in accordance with the directions herein.

Affirmed in part and vacated in part; cause remanded with instructions.

THEIS and REID, JJ., concur.