NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241202-U

NO. 4-24-1202

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| LISA GAYLE BEAUCHAMP, | ) | No. 18CF697 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Daniel Dalton, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Because no reasonable argument could be made in support of defendant's appeal, appellate counsel's motion to withdraw from representing defendant is granted.

¶ 2    In a bench trial, the circuit court of Rock Island County found defendant, Lisa Gayle Beauchamp, guilty of two counts of aggravated battery. See 720 ILCS 5/12-3.05(e)(1) (West 2018). At a subsequent sentencing hearing, the court sentenced her to two consecutive terms of six years' imprisonment. She appeals.

¶ 3    The Office of the State Appellate Defender (OSAD) has filed a motion to withdraw from representing defendant in this appeal. As OSAD explains in a memorandum accompanying its motion, OSAD can think of no reasonable argument to make in support of this appeal (thus ethically obliging OSAD to seek to withdraw). We notified defendant of OSAD's motion and her opportunity to file a response to the motion by a certain date, informing her that

if she filed no response, the case would be submitted to us for disposition. The deadline for a response by defendant has passed, and she has filed no response. The case is ripe for appellate disposition.

¶ 4　　　　After considering OSAD's memorandum and reviewing the record, we agree with OSAD that this appeal lacks arguable merit. Therefore, we grant OSAD's motion for permission to withdraw from representing defendant in this appeal, and we affirm the circuit court's judgment.

¶ 5　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　　　　A. The Charges

¶ 7　　　　On August 16, 2018, the State charged defendant, by information, with two counts of aggravated battery. See *id.* She allegedly committed those offenses on July 26, 2018, by shooting Richard Spencer twice: once in the center of his abdomen (count I) and once in the left side of his abdomen (count II).

¶ 8　　　　Defendant filed an answer raising the affirmative defense of self-defense and waiving a jury.

¶ 9　　　　　　　　　B. The First Fitness Evaluation

¶ 10　　　　On September 28, 2018, defense counsel requested that the circuit court order an evaluation of defendant's fitness to stand trial. Without making a finding whether there was a *bona fide* doubt as to defendant's fitness, the court appointed a clinical and forensic psychologist, Dr. Kirk Witherspoon, to perform an evaluation.

¶ 11　　　　On October 11, 2018, Dr. Witherspoon filed his report. He found that defendant suffered from two mental disorders: (1) "Schizoaffective Disorder, depressive type, with hallucinations and delusions continuous, in partial to full remission," and (2) posttraumatic stress

disorder. Despite those diagnoses, Dr. Witherspoon found that defendant "appear[ed] to possess factual and rational understanding of courtroom participants and procedures, skills to assist defense counsel, and understanding of case events requisite to effectively stand trial, enter a plea, and undergo sentencing." Therefore, he recommended that she "be regarded as fit for adjudication."

¶ 12        At a hearing on November 19, 2018, the parties stipulated to Dr. Witherspoon's qualifications. They further stipulated that if Dr. Witherspoon were called to testify, he would testify consistently with his report. The circuit court ruled as follows:

>        "So based on the parties' stipulation to Dr. Witherspoon's qualifications, which I am also familiar with, of course, and based on the parties' stipulation to the report, based on the stipulated facts contained in the report, I will adopt the opinion of Dr. Witherspoon and find that [defendant] is currently fit to stand trial."

¶ 13                        C. The Second Fitness Evaluation

¶ 14        Defendant attended the first day of trial, December 12, 2022. The next day, however, when the attorneys appeared for the scheduled second day of trial, defense counsel informed the circuit court that defendant had telephoned him that morning and had told him she was "not able to attend because of her mental health." Consequently, defense counsel raised "a *bona fide* doubt in regards to her fitness." The court issued a warrant for defendant's arrest and ordered that, once defendant was in custody, she was to undergo a second fitness evaluation. Although the court did not express an opinion regarding whether there was a *bona fide* doubt as to defendant's fitness, the court remarked, "I would rather be careful. I want to do this once."

¶ 15        On January 11, 2023, a clinical and forensic psychologist, Chad R. Brownfield,

filed a report, in which he diagnosed defendant as having posttraumatic stress disorder and a "History of various Substance Use Disorders (Opioid, Alcohol, Nicotine, & Sedative/Hypnotic/Anxiolytic)." Nevertheless, in Dr. Brownfield's opinion, defendant's "mental condition [did] not significantly interfere with her ability to understand the nature and purpose of the proceedings against her" or "impair her ability to assist in her own defense." Therefore, he opined that, "at this time [defendant] *does* appear to meet the legal criteria for fitness to stand trial." (Emphasis in original.)

¶ 16    At a status hearing on January 27, 2023, the parties stipulated to Dr. Brownfield's qualifications. The parties further stipulated that he would testify consistently with his report. The circuit court signed an order reading as follows:

> "THE COURT FINDS that an evaluation of the Defendant was conducted by Dr. Chad Brownfield on 12-20-22, with a written evaluation having been filed on 1-11-23. The parties have received a copy of the evaluation, and having stipulated to the contents of the evaluation and the professional qualification of Dr. Brownfield, the Court finds that the Defendant is fit to plead, stand trial, and be sentenced at the current time."

¶ 17                                  D. The Third Fitness Evaluation

¶ 18    The bench trial was held on three days: December 12, 2022, June 5, 2023, and October 11, 2023. On July 26, 2023, before what was supposed to be the final day of the bench trial, the prosecutor directed the circuit court's attention to a new criminal case that had been brought against defendant, Rock Island County case No. 23-CF-509, in which she was charged with aggravated assault of a police officer. "The allegation," the prosecutor said, "is pointing a knife at a female Moline Officer." The prosecutor moved that defendant be remanded into

- 4 -

custody on the new charge and that her bond be increased. The prosecutor added that he anticipated filing a motion to revoke defendant's pretrial release.

¶ 19　　　　Defense counsel retorted that the knife-pointing incident happened three weeks ago and that because the State had not yet filed a motion to revoke the bond, the incident must not have raised an urgent concern. Defense counsel explained that the incident was "when my client [was] having a mental health crisis." As defense counsel put it, defendant "cried out for help, the police came, and at this point [she] allegedly pulled a knife of some sort." However, during the three weeks since the knife-pointing incident, defendant had "not been a threat to anyone." Instead, during those three weeks, she had undergone mental health treatment at "Sterling," where she "ha[d] been given new medications."

¶ 20　　　　On August 3, 2023, because of defendant's mental health crisis resulting in the knife-pointing incident, the circuit court entered an order finding a *bona fide* doubt as to defendant's fitness for trial and appointing Dr. Brownfield to perform another fitness evaluation.

¶ 21　　　　At a hearing on September 6, 2023, which defendant personally attended, the prosecutor noted that Dr. Brownfield signed a report the day before. The circuit court observed, "It didn't make it to the court file." Defense counsel handed the court a hard copy—which does not appear to be in the record on appeal (although, at the hearing of September 6, 2023, the prosecutor said he would "e-file it when I get back"). The prosecutor stipulated to "Dr. Brownfield's professional qualifications as an expert in the field of forensic psychology." Also, the prosecutor stipulated that "Dr. Brownfield would testify similarly to what is contained in his report and would recommend [defendant] as fit to stand trial at this time." Defense counsel stated he "would also stipulate to the qualifications and the findings in regards to—as the State founded [*sic*]." After a brief exchange with defendant, the court found as follows:

"So based on the stipulation of the parties, I find that *** the stipulation of the parties and my own experience that Dr. Brownfield is an expert in forensic psychology based on the stipulation of the parties and the facts contained in his report, the conclusions based on those facts, and my own personal observations and [defendant], I find that she is fit to stand trial."

¶ 22                                    E. The Bench Trial

¶ 23                          1. *Spencer's Account of What Happened*

¶ 24          At trial, Spencer testified in the State's case-in-chief, and defendant testified in her own case-in-chief. These two witnesses gave significantly different accounts of what had happened. Here is Spencer's version of the events.

¶ 25          In 2018, Spencer and defendant were friends. Defendant owned a house on 41st Street in Rock Island, Illinois, and before July 26, 2018, Spencer visited her at her house about 10 times. During these visits, he would smoke cannabis with her and supply her with gabapentin and Adderall. He did not recall receiving money from her for these drugs. Sometime in 2018, he considered renting a room in her house, but he ultimately decided not to rent the room.

¶ 26          On July 26, 2018, defendant telephoned Spencer and invited him to come to her house so she could give him some toys and collectibles that he might give to his children. She had given him toys and collectibles in the past, and he agreed to come to her house and see what she now proposed to give him.

¶ 27          When Spencer arrived at defendant's house, a side door was open. From the side door, stairs went down to the basement. Defendant called up from the basement for Spencer to come down. He descended the stairs, carrying a bag containing his wallet, keys, and prescription medicines, namely, sertraline, lisinopril, Pepcid, gabapentin, and Adderall.

¶ 28        As Spencer was coming down the stairs, he spotted, on top of a washing machine, a "Mexican Luchador-like wrestling mask." He remarked to defendant that his son would love that mask. Defendant urged Spencer to come down and try it on. At first, Spencer declined to put on the mask, but when defendant insisted that he do so, he gave in. As he was trying to pull the mask over his head, she stood behind him, loosening the strings. After he succeeded in getting the mask on, he noticed that defendant was now standing some 10 feet in front of him and that she was pointing a rifle at him. He recognized the rifle; he had borrowed it from her in the past. He reached up to take off the mask, but defendant warned him that if he took it off, she would kill him. So, he left the mask on.

¶ 29        At defendant's command, Spencer sat down on a chair, and she took his wallet and phone and began interrogating him. Examining the identification cards (IDs) from his wallet, she asked him what his name was. She also asked him why his phone number was the same as that of her ex-wife. He replied that he had never known she had an ex-wife but that, in any event, it would have been impossible for him and her ex-wife to have the same phone number. She asked him who his family "really was." He answered that his children and his ex-wife were just that: his children and his ex-wife. Defendant was unconvinced: she claimed that his family members were "a plant to make [him] look like somebody that [he] wasn't." She asked him why he had been sending information about her to her ex-wife. He replied that he had never contacted her ex-wife and that he did not even know who her ex-wife was.

¶ 30        Then, as defendant picked up Spencer's phone, she pointed the rifle toward the stairs, and Spencer saw an opportunity. He picked up a child's monster truck, threw it at defendant's face, and charged her. However, by the time he advanced to about three or four feet from her, she turned the rifle upon him and shot him "[a]t least twice" (judging, Spencer

explained, by the two bullets that became lodged in his abdomen). Defendant then yelled upstairs to her mother to call the police, and Spencer added, " ['F]*** yeah, call the cops; this b*** just f*** shot me.['] "

¶ 31        Spencer then wrested the rifle out of defendant's hands, pointed at it her, and as she pleaded with him not to kill her, pulled the trigger. The rifle, however, was jammed and would not fire. He then struck her with the rifle and ran up the stairs and out the side door.

¶ 32        As he drove away in his van, he called 911. He drove to a fire station, where paramedics gave him stabilizing medical treatment before taking him to a hospital.

¶ 33        Spencer's bullet wounds necessitated two surgeries. On the night of the shooting, a surgeon performed a bypass of an artery and removed a bullet from Spencer's abdomen. Additionally, there was a second bullet in his abdomen, but because of the risk of nerve damage, the surgeon decided not to remove it. Later, after this second bullet shifted inside Spencer's body and began causing Spencer unmanageable pain, a second surgeon removed this second bullet, as well as some bone fragments that one of the bullets had broken off of Spencer's hip.

¶ 34        On cross-examination, Spencer acknowledged it was possible that he visited defendant's house another time on July 26, 2018, earlier in the day, although he did not remember doing so. Defense counsel showed him defendant's exhibit No. 3: four photos arranged in a grid, two of which bore a time and date stamp of 6:12 p.m. on July 26, 2018. Spencer agreed that one of these photos was of him standing with defendant outside her house.

¶ 35        2. *Physical Evidence in the State's Case-in-Chief*

¶ 36        In the basement of defendant's house, the police found apparent bloodstains, three spent cartridge cases, one fired bullet, one unfired cartridge, a cell phone, and a credit card bearing Spencer's name. At the top of the stairs leading up from the basement to the side door,

they found a Mexican Luchador-style wrestling mask. In the parking lot of the fire station, they found a .22-caliber rifle, in the chamber of which a spent cartridge case was jammed.

¶ 37    During the police investigation, defendant allowed the police to download video from her home security system. Some of the video showed that on July 26, 2018, at 6:57 p.m., Spencer arrived at defendant's house in a tan minivan, pulled into the driveway, got out of the van holding a black bag, walked toward the rear of the house, and disappeared behind a bay window. At 7:08 p.m., according to this video, he emerged from behind the bay window, running toward the minivan, and now, in addition to the black bag, he was carrying a rifle and some other items that were not clearly discernible.

¶ 38    At trial, the State presented another video from defendant's home security system. The purpose of this other video was to demonstrate that defendant was lying when she claimed or implied to the police that Spencer had pulled and ripped her shirt. This video showed that, at 7:09 p.m. on July 26, 2018, defendant came out of the front door of her house and stood on the front porch and that the tie-dyed pullover shirt she was wearing was undamaged. A Rock Island police officer, Austin Frankenreider, testified that, at 7:17 p.m. on July 26, 2018, he and other police officers arrived at defendant's house in response to a 911 call and that they had to wait outside for half an hour before defendant answered the door. When defendant finally answered the door, Frankenreider noticed that the collar of her shirt was stretched and torn. He identified People's exhibit No. 1 as a still frame from his body camera. This exhibit showed defendant wearing what appeared to be the same tie-dyed shirt she had been wearing in the home security video from 7:09 p.m., except that now the collar of the shirt was stretched and torn.

¶ 39    3. *Defendant's Account of What Happened*

¶ 40    On the second day of the bench trial, in her own case-in-chief, defendant testified

substantially as follows.

¶ 41     In 2018, when she was 55, her mental health was "poor." She was suffering at that time from posttraumatic stress disorder that she had contracted from her service in the United States Air Force between 1980 and 1984. Also, in 2011, when her grandmother passed away, defendant began suffering from depression and anxiety. Additionally, in 2018, "gang activity" in a park abutting her property had caused her to be "extremely scared," and she was upset that her brother had been sent to prison that year.

¶ 42     About a year before the incident in question, defendant met Spencer, who would sell her drugs, such as cannabis, Adderall, and Vicodin. On two occasions, he used drugs with her. He visited her "maybe six times" in 2018.

¶ 43     On July 4, 2018, Spencer came to defendant's house to look at an apartment for which she was seeking a renter. He told her he liked the apartment.

¶ 44     On July 12, 2018, defendant paid Spencer to help her clear some items out of her basement. Spencer spent "a couple more hours" with her in the basement. During that time, she gave him several items, including wrestling figurines and a set of chairs. Also, she allowed him to borrow a rifle that was in the basement, making it clear to him that she wanted the rifle back.

¶ 45     On July 15, 2018, defendant went to the house of Spencer's ex-wife to ask for the rifle back. Although Spencer had not told defendant his ex-wife's address, he had mentioned that she lived near a certain fire station. When driving around in the neighborhood of the fire station, defendant saw, on the front porch of a house, the set of chairs she had given Spencer. She knocked on the door of the house, and Spencer's ex-wife answered. Defendant asked if Spencer was there. He came to the door and was angry with defendant. She told him she wanted the rifle back.

¶ 46        On July 16, 2018, Spencer came to defendant's house and returned the rifle. She noticed that the magazine of the rifle was full of live ammunition.

¶ 47        After Spencer returned the rifle, defendant blocked his number on her phone. Nevertheless, Spencer kept trying to call her, and her phone kept chirping as it blocked his calls.

¶ 48        On July 26, 2018, Spencer came to her house twice. The first time was around 6 p.m., as shown in defendant's exhibit No. 3, a four-camera view from her home security system. She heard a knock on her door, and when she looked on her home security system, it was Spencer. She exited at the side door of her house and met him outside. He offered to sell her some drugs. She declined, explaining to him that she had no money, was not feeling well, and had to go pick up an Air Force friend at the airport. Spencer called defendant a " [']c***,['']" gave her some pills for free, and left. She went back inside her house and flushed the pills down the toilet.

¶ 49        The second visit by Spencer on July 26, 2018, was about 35 to 40 minutes after he left the first time. As defendant was working in her basement, she saw, through a basement window, a pair of legs pass by. About five seconds later, Spencer came down the stairs from the driveway, and he was wearing a Mexican wrestling mask. " [']Hey, give me all your money,['] " he said, and laughed. Defendant told him she wanted him off her property and that she was serious. He would not leave. He was "just kind of joking around and coming closer" and said, " [']Oh, I need some money.['] " He asked her, " [']You don't have any money at all?['] " " [']Richard, I don't,['] " she answered, and again she demanded that he get out of her house. Because Spencer was speaking to her in a "real weird," "[r]eal edgy voice" and was twice her size—340 pounds to her 170 pounds—she was becoming afraid.

¶ 50        Spencer complained to defendant that "it was because of [her that] he couldn't

move in on the 15th." She responded, " [']You never told me who you were. I don't even—you never showed me an ID.['] " He asked, " [']I'm not who you f*** think I am, am I?['] " and after trying and failing to pull the mask off his head, he took his wallet out of his back pocket and flung it at her, telling her, " [']Here's who I am[,] you c***.['] " The wallet struck her in the chest and fell on the floor. She bent over, picked up the wallet, and told him, " [']Hold on. I've got something for you.['] "

¶ 51　　　　Defendant then went into her grandfather's workshop and took down, from among the floor joists, the rifle that Spencer had returned to her. She aimed the rifle at Spencer, and, "at that point, [she] was beyond the water heater." She told him, " [']Get the f*** out of my house. Get out now.['] " She kept repeating that demand, but he kept advancing toward her. Then he sat down, whereupon she "grabbed this Black & Decker temporary workbench and put it in between [her] and the water heater," at the same time pressing the alert button on her home security fob and yelling up to her mother to call the police.

¶ 52　　　　Then Spencer stood up and appeared to be "kind of hiding his left hand." Defendant did not know what was in his left hand. She feared it was a knife. He threw something at her. She "felt this burning in [her] head" after whatever he had thrown struck her there—a toy monster truck, as it turned out—and he "was lunging over the Black & Decker table bench, grabbing the barrel of the gun." He twisted the rifle, breaking her index finger, which she never took off the trigger. Dazed from being hit in the head by the toy truck, defendant "honestly did not hear any gunshots." Spencer was now in possession of the rifle, and he used it to hit her in the area of her neck and ear. She fell down between the water heater and the furnace. Then, standing over her, he aimed the rifle at her. She raised her hand and pleaded, " [']No, Richard. Please don't. Don't, don't, don't.['] " Apparently, the rifle was jammed; it would not fire. She

started to get up, but he put her in a headlock and, stepping on her back, punched her three or four times in the back of the head, telling her " [']Stay down, b***. Stay down.['] " She did not stay down. She got to her feet and ran for the stairs. He grabbed the back of her shirt and started pulling her down, but she made it up the stairs anyway.

¶ 53        Defense counsel asked defendant:

"Q. *** Now, he didn't rip that shirt. You later on had ripped that shirt, correct?

A. Yes.

Q. And that was because of frustration that you had?

A. Yes."

On cross-examination, however, defendant admitted that she implied to the police that her shirt had been ripped "in some sort of attack."

¶ 54        Defendant further testified, on cross-examination, that she had considered renting the apartment to Spencer but that when they spent some time together on July 12, 2018, she was so offended by his use of profanity that she came to believe he was a "dangerous character." Also, when Spencer recounted to her his time in the United States Army, what he told her did not ring true, leading her to conclude that he was lying about having served in the Army. Additionally, about nine months prior to the incident of July 26, 2018, at the apartment of their mutual friend, Spencer started a fight with defendant and the friend, and the fight became so boisterous that the friend's landlord had Spencer leave the premises. Finally, the real reason why defendant was afraid of Spencer was that, on July 12, 2018, he took her rifle without her permission and did not return it until July 16, 2018.

¶ 55        Defendant denied telling a Rock Island detective, Chad Sowards, that she thought

that Spencer was part of the "Mexican Mafia." She denied telling Sowards that Spencer had ripped her shirt. She denied demonstrating to Sowards, by pulling on the part of her shirt that had been ripped, how Spencer had ripped her shirt. She admitted telling Sowards, however, that when Spencer came to her house on July 26, 2018, she believed that Spencer had come to kill and take her stepmother to the bank and drain her stepmother's bank account.

¶ 56                              4. *The State's Case in Rebuttal*

¶ 57            On the third day of the trial, the State presented its case in rebuttal. The State called Detective Sowards, who testified that, on the night of the incident, he interviewed defendant in an interview room at the Rock Island police station. He denied that defendant was under arrest at that time. In fact, to beguile her into speaking without inhibition, he repeatedly told her, during the interview, that he considered her to be "the victim." After the interview, she was free to leave.

¶ 58            The prosecutor moved for the admission and publication of People's exhibit No. 24, a video of Sowards's interview of defendant. Defense counsel objected to a wholesale presentation of the video. He argued that only the parts of the video that were impeaching should be presented. The prosecutor responded that, instead of seeking to introduce the video as impeachment, he intended to introduce it as rebuttal evidence. Defense counsel argued, however, that rebuttal *was* impeachment. The circuit court decided that, regardless of whether the video was described as "impeachment" or "rebuttal," the State should be allowed to "put forth evidence to show that [defendant's] version of events have changed, whether they be very specific details or overarching narrative." Therefore, the court overruled the objection.

¶ 59            In the video, defendant told Sowards essentially the following. About a month and a half or two months before the incident, a friend introduced her to Spencer, who wanted to rent

- 14 -

an apartment from her. When she ran a background check on Spencer, however, he "didn't check out at all." He had falsely represented to her that his first name was Ronald or Rodney. Also, his address "didn't check out," and he "had three felonies."

¶ 60     Although defendant declined to rent the apartment to Spencer, he kept coming to her house. On the day of the incident, he stopped by and gave her four pills of nausea medication. They were outside the house, and when he started moving toward the side door, she told him she had to leave and pick up a friend and that she did not want Spencer on her property. She told him to leave and not come back. He left.

¶ 61     Defendant then went back to working in her basement, and Spencer showed up again, standing on the basement stairs. At that point, defendant "knew it would be trouble." Her mother and her brother had inherited large sums of money, which people had been trying to steal. People had stolen checks from defendant and had caused her mail to be forwarded to other addresses. Inmates at the Henry County jail had been phoning defendant and threatening to harm her brother unless she paid them off. She knew that Spencer was involved in that conspiracy, as well as in a conspiracy of "meth heads" from East Moline, Illinois, who were squatting in houses and forcing their owners to pursue lengthy eviction litigation. It was because of a "big Mexican Mafia guy" that federal charges were brought against her brother, and she knew that Spencer had come to her house to kill her.

¶ 62     When Spencer came down the basement stairs, defendant offered him a soda. He then reached into his pants, pulled out a Mexican wrestling mask, pulled it over his head, and told defendant to " [']sit the f*** down.['] " Defendant sat on a chair and pressed the alert button on her home security fob. Spencer told her, " ['T]his time[,] b***, we gonna get the money['] "—by which she understood him to mean he was going to take her mother to the bank

and force her to give him all the money in her bank account.

¶ 63    Spencer then reached up among the floor joists of the basement ceiling and took down a ".22." About a week earlier, he borrowed this gun from defendant and, at her request, stowed it among the floor joists when he returned it. When he took down the gun, defendant tried to run upstairs, into the house, but he grabbed her by the shirt and threw her against the water heater. (In the video of the interview, defendant demonstrated this part of her narrative by grabbing the area of her shirt that was ripped.) Spencer then put down the gun and punched defendant six to eight times. After pummeling her, he picked up the gun again, pointed it at her, and pulled the trigger, but the gun would not fire. Defendant pleaded, " [']No, Richard, no, no, no.['] " Spencer then left the house, taking the gun with him.

¶ 64    Later in the interview, Sowards confronted defendant with the fact that police officers had found blood and spent cartridge cases in her basement. Only then did defendant admit that she had shot the gun "three or four times down there." Sowards further informed defendant that Spencer was in the hospital with gunshot wounds. Defendant then claimed that Spencer had shot himself. She denied hearing gunfire during her interaction with Spencer in the basement. She explained, however, that the gun was a .22-caliber and, thus, was not loud. When Sowards asked defendant directly if she had shot Spencer or pulled a gun on him, she answered no to both questions.

¶ 65    5. *The Findings of Guilt and the Sentences*

¶ 66    In his closing argument, defense counsel maintained that defendant had shot Spencer in self-defense. The circuit court found, however, that defendant shot Spencer before he committed any act of aggression against her. In the court's view, none of defendant's accounts of what had happened were credible. The court found her guilty of both counts of aggravated

- 16 -

battery. The court did not yet make a finding as to whether she had inflicted severe bodily injury upon Spencer.

¶ 67        Defense counsel filed no posttrial motion.

¶ 68        At the sentencing hearing, the prosecutor argued that defendant's actions had caused severe bodily injury to Spencer and, therefore, under section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2018)), the sentences on counts I and II should run consecutively. The circuit court continued the sentencing hearing so that the parties could research the application of Section 5-8-4(d)(1).

¶ 69        When the sentencing hearing reconvened, the circuit court noted that, under *People v. Wagener*, 196 Ill. 2d 269 (2001), waiting until the sentencing hearing to make a finding on the issue of severe bodily injury was the correct procedure. The State supplemented the presentence investigation report with letters from the surgeons who had operated on Spencer. According to these letters, two bullets had been lodged in Spencer's abdomen, and in 2018, only one of the bullets could be removed. Subsequently, the second bullet caused Spencer such pain and so limited the function of his right hip that, in 2022, this bullet likewise was surgically removed. Even after the second surgery, he still suffered pain in his hip and sciatic nerve. In their letters, both surgeons characterized the gunshot wounds as "great bodily harm."

¶ 70        Defense counsel disputed that Spencer sustained severe bodily injury, considering that he was able to disarm defendant, escape from her house, and drive to the fire station. The circuit court observed, however, that, under *People v. Deleon*, 227 Ill. 2d 322 (2008), a victim could be regarded as having suffered severe bodily injury even though the victim succeeded in escaping from the scene where the injury was inflicted. The court found that Spencer's two surgeries, his unremitting pain, and his impaired hip function called for a finding that he had

suffered severe bodily injury. Accordingly, for counts I and II, the court sentenced defendant to two consecutive terms of six years' imprisonment.

¶ 71　　　　Defense counsel filed a postsentencing motion, in which he argued that because the letters from the two surgeons opined that Spencer had sustained "great bodily harm" instead of severe bodily injury, the evidence at the sentencing hearing did not support a finding of severe bodily injury. The circuit court denied the postsentencing motion, reasoning that just because the surgeons used the term "great bodily harm," the court was not precluded from finding, from the evidence, that Spencer's gunshot wounds and resulting pain and impairment qualified as severe bodily injury.

¶ 72　　　　This appeal followed.

¶ 73　　　　　　　　　　　　　　II. ANALYSIS

¶ 74　　　　In its memorandum in support of its motion for permission to withdraw from representing defendant, OSAD explores three potential issues and concludes that none of the three issues has arguable merit.

¶ 75　　　　　　　　　　A. The Consecutiveness of the Prison Terms

¶ 76　　　　The first issue that OSAD explores is "whether the preserved claim that the judge erred in sentencing the defendant to consecutive terms is viable in this appeal." (Any sentencing issue left out of the postsentencing motion is unpreserved for appeal. See *People v. Harvey*, 2018 IL 122325, ¶ 15.) OSAD begins with section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2018)), providing that prison terms for multiple convictions must be served consecutively if one of the offenses of which the defendant was convicted was a Class X felony or Class 1 felony and the defendant "inflicted severe bodily injury." OSAD notes that, under *Wagener*, 196 Ill. 2d at 286, "the factual findings required by Section 5-8-4(d)(1) are not

- 18 -

subject to the pleading and proof requirements of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and can be made by a preponderance of the evidence at sentencing" (to quote OSAD's memorandum). OSAD further notes that, under *Deleon*, 227 Ill. 2d at 332, "a trial court's determination that a bodily injury is 'severe' for purposes of consecutive sentencing may be reversed only if it is against the manifest weight of the evidence" (to quote *Deleon*). OSAD points out that counts I and II of the information in this case were Class X felonies (see 720 ILCS 5/12-3.05(h) (West 2018) ("Aggravated battery as defined in subdivision (e)(1) [(*id.* § 12-3(e)(1))] is a Class X felony.")). Recounting the surgeries, the pain, and the hip problems that Spencer endured as a result of these Class X felonies, OSAD concludes it would be impossible to argue, in seriousness, that the circuit court made a finding that was against the manifest weight of the evidence by finding that Spencer sustained a severe bodily injury from the two bullets lodged in his abdomen.

¶ 77    We agree with that conclusion. "A finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or if the finding is unreasonable, arbitrary, or not based on the evidence presented." *People v. Earnest*, 2024 IL App (2d) 230390, ¶ 14. No one could argue, in good faith, that it was unreasonable or arbitrary of the circuit court to characterize the two gunshot wounds to Spencer's abdomen, necessitating two surgeries to remove the bullets and broken-off hip bone fragments, as severe bodily injuries. No one could seriously maintain it is clearly apparent that these injuries were less than severe. We agree with OSAD that the single preserved sentencing issue could not be ethically argued on appeal.

¶ 78                    B. The Sufficiency of the Evidence

¶ 79    Because defendant filed no posttrial motion, she preserved no trial issue for review. See *People v. Galarza*, 2023 IL 127678, ¶ 46; *People v. Enoch*, 122 Ill. 2d 176, 186

(1988). OSAD observes that, despite the lack of a posttrial motion, a defendant could argue on appeal that the evidence was insufficient to support the conviction. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008). In OSAD's assessment, however, "no such argument would be viable in this case."

¶ 80　　　　OSAD begins its sufficiency-of-the-evidence assessment with the standard of review. To quote *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)), " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)

¶ 81　　　　OSAD explains that, under section 12-3.05(e)(1) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/12-3(e)(1) (West 2018)), "the State was required to prove beyond a reasonable doubt that defendant discharged a firearm two times, both times causing injury to Spencer." OSAD reasons that the exact locations of Spencer's gunshot wounds, though specified in the information, were mere surplusage, which the State was not required to prove. See *People v. Collins*, 214 Ill. 2d 206, 219-20 (2005); *People v. Williams*, 28 Ill. 2d 280, 285 (1963). The elements of aggravated battery were simply that, "in committing a battery," defendant "knowingly *** [d]ischarged a firearm *** and cause[d] any injury to" Spencer. 720 ILCS 5/12-3(e)(1) (West 2018).

¶ 82　　　　OSAD regards the evidence as having proved, overwhelmingly, that Spencer was shot twice. We agree that the evidence was overwhelming in that respect. That it would be *impossible* for a rational trier of fact to find, beyond a reasonable doubt, that defendant knowingly shot Spencer twice is an argument that, in OSAD's assessment, could not be made in good faith. Viewing all the evidence in the light most favorable to the prosecution, we arrive at

the same assessment. Although it is true that defendant did not specifically admit shooting Spencer, she testified that she "never let [her] finger off the trigger," and she told Sowards that she fired the rifle "three or four times down there" (in the basement). That Spencer shot himself twice in the abdomen, as defendant suggested to Sowards, could strike a rational trier of fact as preposterous. It would be—at the least—reasonable to conclude that it was defendant who shot Spencer in the abdomen and that the knowingness of her doing so was confirmed by her shooting him in the abdomen a second time.

¶ 83    In fact, defendant's affirmative defense was that she shot Spencer in self-defense—an act that necessarily would have been knowing. As OSAD notes, the same deferential standard of review applies to the circuit court's factual finding against defendant on this affirmative defense. "The relevant standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, that defendant did not act in self-defense." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 84    Under section 7-1 of the Criminal Code (720 ILCS 5/7-1 (West 2018)), there are six elements of self-defense:

> "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Lee*, 213 Ill. 2d at 225.

If the State negates any of those elements, the claim of self-defense fails. *People v. Gray*, 2017

IL 120958, ¶ 50. The circuit court found that the State had negated the second element of self-defense. The court believed Spencer's testimony that, after inviting him into her basement, defendant aimed the rifle at him, making herself the aggressor. By the same token, the court disbelieved defendant's testimony. Unless the court's "determinations about the relative credibility of witnesses" are "clearly irrational," we are obliged to accept those credibility determinations. *People v. Little*, 2018 IL App (1st) 151954, ¶ 43.

¶ 85    OSAD does not think that the circuit court's credibility determinations in this case could be honestly characterized as clearly irrational:

> "To the extent that the defendant's testimonial account suggested that Spencer physically intimidated her before she produced the rifle, a reasonable trier of fact could have doubted her credibility. The evidence at trial established that the defendant gave a substantially different account to Sowards, in which Spencer introduced the rifle to the situation and attacked the defendant as she attempted to flee. [Citation.] The evidence also established that the defendant tore her own shirt after the incident, then used that torn shirt to demonstrate to Detective Sowards how Spencer allegedly grabbed her and threw her during the incident [Citations.] A reasonable trier of fact could have concluded that Spencer's version of the incident was more credible and, under his version, could have found that the defendant did not act in self defense because she was the initial aggressor."

We agree—and we might add that, in the view of a rational trier of fact, defendant's assertion to Sowards that Spencer was an imposter involved in various conspiracies against her could lend credence to Spencer's testimony that, without any threatening behavior by him, she pulled a rifle on him and interrogated him on who he and his family members really were. In short, OSAD is

correct that, under our deferential standard of review, the circuit court's choice to believe Spencer's testimony is unassailable.

¶ 86                              C. The Fitness Proceedings

¶ 87            OSAD notes that, despite the lack of a posttrial motion, errors in the fitness proceedings might be reviewed under the doctrine of plain error. See *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). Therefore, in its memorandum, OSAD discusses whether a reasonable argument could be made that plain error was committed in the fitness proceedings.

¶ 88            As OSAD observes, in three separate fitness examinations in this case, forensic psychologists found defendant to be fit to stand trial, and the circuit court accepted those findings. The court relied not only on the parties' stipulations that the experts would testify as they had written in their reports, but the court relied also on the reports themselves. See *People v. Contorno*, 322 Ill. App. 3d 177, 179 (2001). OSAD sees no arguable plain error in the fitness proceedings.

¶ 89            Nevertheless, we see an error in the fitness proceedings. At the hearing of September 6, 2023, the judge relied in part on his "own experience that Dr. Brownfield is an expert in forensic psychology." "In a bench trial, a judge's determination based on his own private knowledge, that is untested by cross-examination or the rules of evidence, amounts to a denial of due process." *People v. Hamilton*, 361 Ill. App. 3d 836, 849 (2005). We see no reason why the same principle would not apply equally to a fitness proceeding. See *People v. Salinas*, 383 Ill. App. 3d 482, 500 (2008) (regarding a suppression hearing). Because this judicial consideration of personal experience in other cases (as distinct from "practical considerations of everyday life" (*People v. Brumley*, 229 Ill. App. 3d 16, 20 (1992)) was an error of constitutional dimension, reversal would be required unless this error was harmless beyond a reasonable doubt.

See *In re E.H.*, 224 Ill. 2d 172, 180 (2006) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

¶ 90          We do not see how it could reasonably be disputed that this error was harmless beyond a reasonable doubt. Although the third fitness examination was preceded by a judicial finding that there was a *bona fide* doubt of defendant's fitness to stand trial, the record appears to be devoid of "facts rais[ing] a real, substantial, and legitimate doubt regarding a defendant's mental capacity to meaningfully participate in [her] defense." (Internal quotation marks omitted.) *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 45. At trial, by taking the stand and testifying with reasonable coherence, providing an account that was favorable to the defense, defendant conclusively demonstrated her mental capacity to meaningfully participate in her defense.

¶ 91                                III. CONCLUSION

¶ 92          For the reasons stated, we grant OSAD's motion to withdraw and affirm the circuit court's judgment.

¶ 93          Affirmed.